**BOSTON TRADING GROUP, INC., et al., Plaintiffs, Appellees,**

v.

**Robert A. BURNAZOS, et al., Defendants, Appellants.**

**BOSTON TRADING GROUP, INC., et al., Plaintiffs, Appellants,**

v.

**Robert A. BURNAZOS, et al., Defendants, Appellees.**

**Nos. 87–1169, 87–1170.**

United States Court of Appeals, First Circuit.

Heard Sept. 10, 1987.

Decided Dec. 30, 1987.

Rehearing Denied Feb. 2, 1988.

---

Joel Z. Eigerman, P.C. with whom Ian Veitzer and McCormack & Putziger, Boston, Mass., were on brief, for Robert E. Burnazos, et al.

Michael A. Collora with whom Susan Hughes Banning and Hemenway & Barnes, Boston, Mass., were on brief, for Boston Trading Group, Inc., et al.

Before CAMPBELL, Chief Judge, GARTH,[*] Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

These cross appeals raise questions about the meaning of key provisions in a Massachusetts statute forbidding fraudulent conveyances. Mass.Gen.Laws ch. 109A, §§ 1–13 (1986). The statute, enacted in 1924, is a uniform state law that codifies both common and statutory law stretching

[*] Of the Third Circuit, sitting by designation.

back at least to 1571 and the Statute of Elizabeth. 13 Eliz. c. 5 (1571); *see* 1 G. Glenn, *Fraudulent Conveyances and Preferences*, §§ 58–62 (rev. ed. 1940). Because we disagree with the district court about the meaning of the statutory provisions, and for other, more technical reasons, we order a new trial.

## I

### *Background*

A. *Facts*

The plaintiff in this case is the receiver of two companies, Boston Trading Group (BTG) and Northeast Investment Services (NIS), that managed pools of money for commodities investors. He has sued the defendant, Robert Burnazos, claiming that two men who owned and managed BTG and NIS, Richard Shaw and Theodore Kepreos, fraudulently conveyed to Burnazos money that rightfully belonged either to BTG and NIS or to investors in the commodity pools those companies managed. The Receiver's allegations can be roughly summarized as follows:

(1) In 1978, Burnazos and Shaw worked for (or owned) various companies that managed commodity pools. Burnazos had some reason to believe Shaw was dishonest, for customers complained about him.

(2) In 1979, Burnazos bought BTG for $200,000. In 1980, Shaw and Kepreos founded NIS, intending to obtain NIS investors' money dishonestly, which they accomplished by "churning" the investors' accounts (*i.e.*, making unnecessary trades to obtain commissions). Burnazos knew (or should have known) about this dishonest activity.

(3) In October 1981, Burnazos sold BTG to Shaw and Kepreos at a price equal to 28 percent of the assets in the BTG pools (a price of about $1.6 million). Using money from the excessive commissions they had charged their NIS investors, Shaw and Kepreos gave Burnazos a $400,000 down payment. Shaw and Kepreos signed a note to Burnazos for the rest of the money, payable in 16 installments of approximately $73,000 each. Burnazos's only recourse

for payment of the note was against the assets of BTG and NIS.

(4) After the sale, NIS stopped doing business, its customers having lost more than $3 million. In mid-December, Shaw and Kepreos paid Burnazos the first $73,000 installment. In late December, Burnazos learned that Shaw and Kepreos were taking large amounts of money from BTG's investors. In January, Burnazos learned that BTG had stopped doing business. He then brought a state court lawsuit against Shaw, Kepreos, BTG, and NIS, claiming that they had conspired to destroy the two companies, and thereby impaired his only security for payment of the note.

(5) On January 21, 1982, Burnazos, Shaw, and Kepreos settled the state court lawsuit for $400,000. Shaw and Kepreos paid Burnazos this sum with certified checks, most of which did not indicate who bought them. At least some, but perhaps not all, of the money for the checks came directly from BTG.

Burnazos acknowledged most of these facts, but he denied knowing anything of Shaw and Kepreos's dishonesty until *after* they had made the first $73,000 installment payment in December 1981.

B. *Procedural Facts*

In February 1982, apparently at the request of the Commodity Futures Trading Commission, *Commodity Futures Trading Commission v. Northeast Investment Services, Inc.*, No. 82–0305–Mc (D.Mass. Feb. 5, 1982), the federal district court appointed Michael A. Collora temporary receiver of BTG and NIS. The court authorized Collora, as receiver, "to prosecute all claims ... and suits in equity on behalf of NIS and BTG." The Receiver subsequently brought several lawsuits, including the present one against Robert Burnazos.

The Receiver's basic claim in this lawsuit is that the transfers to Burnazos violated the Massachusetts Fraudulent Conveyance Act, Mass.Gen.Laws ch. 109A (1986). That is to say, the payment of $400,000 (as down payment for BTG) in October 1981, the payment of $73,000 (as first installment) in December 1981, and the payment of $400,-

000 (as settlement of the state court suit) in January 1982 all (allegedly) violated two basic provisions of that Act. The first of these, Mass.Gen.Laws ch. 109A, § 7 (1986), concerns 'actual fraud':

> Every conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

The second, Mass.Gen.Laws ch. 109A, § 4 (1986) concerns 'constructive fraud':

> Every conveyance made ... by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made ... without a fair consideration.

This second provision must be read together with Mass.Gen.Laws ch. 109A, § 3 (1986), which defines "fair consideration":

> Fair consideration is given for property ... when in exchange for such property ... as a fair equivalent therefor and in good faith, property is conveyed or an antecedent debt is satisfied....

The court and the parties treated the payments separately. In respect to the $400,000 down payment made in October 1981:

(1) The trial court held there was not sufficient evidence of a § 7 violation ('actual fraud') to allow the claim to go to the jury;

(2) The jury decided the § 4 claim ('constructive fraud') in favor of Burnazos. It found (in a special verdict) that Burnazos had given fair consideration for the $400,000 down payment, i.e., he gave a "fair equivalent" in "good faith."

In respect to the $73,000 installment paid in December 1981 and the $400,000 settlement paid in January 1982:

(1) The trial court held there was not sufficient evidence of a § 7 violation ('actual fraud') to allow the claim to go to the jury;

(2) The jury decided the § 4 claim ('constructive fraud') in favor of the Receiver. In its special verdict, the jury said that the installment and settlement transfers were "made ... without a fair consideration" because Burnazos had not paid a "fair equivalent" in "good faith." We add that, in respect to the jury's award, it was not clear whether BTG, on the one hand, or Shaw and Kepreos, on the other, had transferred the money to Burnazos, for the transfers mostly took the form of certified bank checks without definite indication of who bought them. The jury did not identify the transferor; rather, it simply awarded the Receiver approximately $436,000.

Both sides have appealed this verdict. Basically, Burnazos says that the trial court's instructions in respect to § 4 were wrong, and there must be a new trial. The Receiver says the instructions were adequate, but, he adds, if there must be a new trial, the jury should also consider the § 7 issues, issues which, in his view, the trial court wrongly kept from the jury.

## C. *Legal Background*

The reader may understand our decision in this case more easily by keeping in mind the following legal background.

1. The pattern of facts the Receiver alleges may seem to cry out for relief as a matter of simple justice, but the legal principles that most readily provide the necessary relief are not involved in this case. The suggested pattern is one in which B, with C's full knowledge, dishonestly takes money from A and gives it to C. It seems fair (given C's knowledge) that ordinarily A should be able to sue C for return of his money. The law of restitution has developed equitable principles that typically permit just this kind of suit. Thus, the Massachusetts courts treat an investment advisor's wrongful taking of his clients' money as an embezzlement, they impose a "constructive trust" upon these funds, and those who take such funds "with knowledge" must return them to the original owner. *Mickelson v. Barnet*, 390 Mass. 786, 790, 460 N.E.2d 566 (1984); *see also Berry v. Kyes*, 304 Mass. 56, 59, 22 N.E.2d 622 (1939); *National Mahaive Bank v. Barry*, 125 Mass. 20, 24 (1878); *cf. Proctor v. Norris*, 285 Mass. 161, 164, 188 N.E. 625

(same if transferee *should* have known of breach of trust); *see generally Restatement of Restitution* § 202.

Similarly, if a person with knowledge of a theft takes money from the thief—even without any special trust relationship to the victim—that person must return the money to the victim when asked, for the courts impose a special equitable 'constructive trust' upon the proceeds. *See generally* Annotation, "Imposition of Constructive Trust in Property Bought with Stolen or Embezzled Funds, 38 A.L.R.3d 1354 (1971); 5 A. Scott, *Scott on Trusts*, §§ 507–508.2 (3d ed. 1967).

In this case, however, we are concerned not with these well-established principles of restitution, but with Fraudulent Conveyance Law, a set of legal (not equitable) doctrines designed for very different purposes. *See generally* 1 G. Glenn, *supra*, §§ 58–62. Given the existence of a remedy elsewhere in the law, it is not surprising that courts have seen no need to shape fraudulent conveyance law to provide relief in the typical case suggested by the fact pattern the Receiver alleges.

2. The fraudulent conveyance statute here at issue codifies law of ancient lineage. Commentators, after reviewing hundreds of cases, as well as the Massachusetts cases that we have reviewed (cited throughout this opinion), describe the object of that law as different from that of the law of restitution. *See* Clark, "The Duty of the Corporate Debtor to its Creditors," 90 Harv.L.Rev. 505, 505–17 (1976); *see generally* 1 G. Glenn, *supra*. Fraudulent conveyance law permits creditors to recover money that a debtor has disposed of in a manner similar to that described by the following three basic paradigm examples:

First (and most important), suppose that a debtor conveys property to a friend whom he expects will use the property in a way that benefits the debtor (suppose, for example, the friend lets the debtor retain possession of the property or secretly agrees to return the property after the debtor's creditors have given up). In such a case, the debtor in effect lies to his creditors, pretending he has no property left, when he really has some (in the hands of his friend). The law calls this untruthful kind of conveyance "fraudulent" and permits the creditor to void the transfer and attach the property in order to satisfy his debt. *E.g.*, *Martell v. Dorey*, 235 Mass. 35, 126 N.E. 354, *cert. dismissed*, 254 U.S. 665, 41 S.Ct. 148, 65 L.Ed. 465 (1920); *Whitney v. Leominster Savings Bank*, 141 Mass. 85, 6 N.E. 551 (1886); *Wheeler v. Train*, 20 Mass. 255 (1825); *see* Clark, *supra*, at 508–09; 1 G. Glenn, *supra*, § 299c.

Second, suppose the debtor transfers his property to a family member or friend or someone else in a 'special relationship,' but does not himself expect to continue to benefit from the property. Rather, he simply prefers that the property go to a friend rather than to an enemy or to a stranger. This type of transfer violates the principle, "be just before you are generous," and the creditor can recover from the friend. *E.g.*, *Blake v. Sawin*, 92 Mass. 340 (1865); *see* Clark, *supra*, at 509–10; 1 G. Glenn, *supra*, §§ 264–72.

Third, suppose the debtor exchanges assets a creditor might readily reach (say, shares of stock) for assets that are difficult for a creditor to seize (illiquid assets, or, say, a homestead). Even though the conveyance is open, truthful, and not to a friend, it hinders creditors in their efforts to satisfy their debts. The creditor will (in some circumstances but not when the transfer is *merely* to satisfy an antecedent debt) be able to void the transfer and seize the assets. *E.g.*, *Rolfe v. Clarke*, 224 Mass. 407, 113 N.E. 182 (1916); *see* Clark, *supra*, at 512–13; 1 G. Glenn, *supra*, § 277.

The cases and the commentators also state that fraudulent conveyance law does *not* seek to void transfers in a fourth circumstance known as a "preference." Suppose a debtor owes A $10,000 and B $20,000. He has only $8000, which he uses to satisfy his debt to A. This conveyance may be unfair to B, but it is not a 'fraudulent conveyance' because it satisfies a debt owed to a person who is, at least, a legitimate creditor. B must find a remedy in bankruptcy, or in some other, law. *See* 1

G. Glenn, *supra*, § 289 (explaining that the intent of fraudulent conveyance statutes " 'is not to provide equal distribution of the estates of debtors among their creditors; there are other statutes [in bankruptcy] which have that effect' " (quoting *In Re Johnson*, 20 Ch. D. 389 (1881)). The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them. *See, e.g., Goldstein v. Columbia Diamond Ring Co., Inc.*, 366 Mass. 835, 323 N.E.2d 344 (1975); *Banca Italiana Di Sconto v. Bailey*, 260 Mass. 151, 157 N.E. 40 (1927); *Banfield v. Whipple*, 96 Mass. 13 (1867); *Smith v. Whitman*, 39 N.J. 397, 189 A.2d 15 (1963); *Skinner v. Overend*, 190 Minn. 456, 252 N.W. 418 (1934); *Old Kent Bank v. Royce*, 264 Mich. 242, 249 N.W. 838 (1933); *Merchants' Bank v. Page*, 147 Md. 607, 128 A. 272 (1925); Clark, *supra*, at 513–16; 1 G. Glenn, *supra*, § 289.

3. It is also important to understand the basic difference between 'actual fraud' and 'constructive fraud.' The distinction arises out of the fact that common law courts sometimes found it difficult to decide whether a debtor's conveyance, say to a relative or associate, in fact amounted to a device to "hinder, delay or defraud" creditors while reserving some benefit for the debtor. The courts gradually developed a set of objective criteria, known as "badges of fraud," that they would use as a basis for inferring fraudulent intent. When "badges," such as insolvency and inadequate consideration, were present, the courts would presume fraud and void the transaction. In § 3 and § 4 of the Uniform State Law, the 'constructive fraud' provisions, the Commissioners codified some of those "badges." *See* UFCA, 7A U.L.A. 427–29 (1985) (Commissioners' prefatory note); UFTA, 7A U.L.A. 639 (1985) (Commissioners' prefatory note); Rosenberg, "Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware," 125 U.Pa.L.Rev. 235, 248 n. 33 (1976). In § 7 of the Act, the Commissioners codified 'actual fraud,' meaning an actual intent to defraud as exemplified by the three paradigms we discussed above.

With these basic principles in mind, we shall turn to the particular questions raised in the appeal. We shall first (in Part II) discuss the claim that Shaw and Kepreos's later payments to Burnazos—the $73,000 installment and the $400,000 settlement— were fraudulent; we shall then discuss (in Part III) the $400,000 down payment.

## II

### *The $73,000 December and $400,000 January Payments*

As previously mentioned, the Receiver argued that the $73,000 installment and the $400,000 settlement amounted to both 'actual' (§ 7) and 'constructive' (§ 4) fraudulent conveyances. The district court permitted only the § 4 claims to reach the jury, which then found in the Receiver's favor. The jury's verdict, while special, Fed.R.Civ.P. 49(b), nonetheless failed to make two critical distinctions. It lumped together the $73,000 installment and the $400,000 settlement (the verdict form did not ask it to treat these transfers separately), and it did not explicitly state *who* had made the transfers.

The Receiver, faced with certified bank checks that did not say who had bought them, had argued in the alternative. In count 3 of his complaint, the Receiver asserted that Shaw and Kepreos were "debtors" who owed money to BTG, and that when *they* transferred the money to Burnazos, *they* defrauded *their* creditor BTG. In count 4 of his complaint, the Receiver asserted that BTG was the debtor that owed money to investors in its commodity pools, and that when *it* transferred the money to Burnazos, *it* defrauded *its* creditors, the investors. The money must have come *either* from Shaw and Kepreos *or* from BTG; either way (says the complaint) the Receiver wins.

Since the jury did not say who it believed was the transferring debtor, we cannot determine which theory it accepted. But we have analyzed both theories and find that, either way, a new trial is necessary.

### A. *BTG as Creditor; Shaw and Kepreos as Transferor*

We start with the Receiver's count 3 theory: Shaw and Kepreos are the debtors who owed money to BTG and who transferred money to Burnazos; BTG is the 'defrauded' creditor seeking its money back from Burnazos, the transferee. We shall first give a simple reason why a new trial is needed in respect to the § 4 violation; we shall next explain why the district court was correct in keeping the § 7 claim from the jury; we shall finally provide a more complicated reason why a new § 4 trial is needed, a reason that our § 7 discussion will help the reader to understand.

 1. The simple reason why Burnazos is entitled to a new trial on the § 4 ('constructive fraud') claim, is that the jury did not find Shaw and Kepreos (the debtors/transferors on this theory) insolvent, as § 4 requires. To set aside the transfer and recover the money (on count 3's factual assumptions), the Receiver must show that (1) as of the time of the transfers, the transferors "[are] or will be thereby rendered insolvent" *and* (2) Burnazos did not give "fair consideration" (defined in Mass. Gen.Laws ch. 109A, § 3 as a "fair equivalent" given in "good faith"). Mass.Gen. Laws ch. 109A, § 4. The court, however, despite the defendant's request, did not instruct the jury that they must find Shaw and Kepreos insolvent.

We cannot say the evidence was so strong as to require, as a matter of law, a finding of insolvency. Burnazos apparently concedes that Kepreos was insolvent at the relevant times, December 1981 and January 1982, but he points to conflicting evidence in the case of Shaw. At one point, Shaw said he had been insolvent at some time in late 1981, but it seems to us that this single, brief statement does not conclusively prove insolvency in December 1981 and January 1982, in light of Shaw's other testimony that he was worth many millions both in 1980 and in 1981, and the lack of any evidence showing that expenses, after debts, accounted for all the previously existing millions. Burnazos thus permissibly argued to the jury that Shaw was not insolvent in January 1982. Since there is no reason to think Kepreos alone transferred the money, the court should have instructed the jury to determine the matter; and, without that instruction, a verdict on count 3 that the transfers violated Mass.Gen. Laws ch. 109A, § 4 cannot stand.

 2. Since there must be a new trial, we turn to the Receiver's argument that the trial should encompass his (count 3) claim that the transfers violated not only § 4, but also the Act's 'actual fraud' provision, § 7, which makes "fraudulent" every transfer made "with actual intent" (as opposed to "intent presumed in law") to "hinder, delay or defraud ... creditors." In effect, the Receiver argues that Shaw and Kepreos took the $473,000 from BTG by fraud (or other dishonest means) and paid it to Burnazos who had full knowledge of their dishonesty.

We rephrase the legal question slightly both to reflect the evidence and to avoid the potentially confusing coincidence that we are dealing with a form of initial dishonesty (*i.e.*, the 'churning' of accounts by Shaw and Kepreos) that itself happens to be called fraud. Suppose that S & K, officers of Corporation C, obtain C's money through dishonest means (larceny, fraud, etc.) and use it to pay a debt that S & K owe B, a transferee who knows of, *but did not participate in,* S & K's dishonesty. Does § 7 of the Massachusetts Fraudulent Conveyance Act permit C to recover its money from B? We think the district court correctly ruled that § 7 does not.

First, we have found no modern case (nor any reference in any modern case, treatise, or article to any case in the past 400 years) that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns not S & K's transfer to B, but *the manner in which the original debt to C arose.* Fraudulent conveyance law is basically concerned with *transfers* that "hinder, delay or defraud" creditors; it is not ordinarily concerned with how such debts were created.

Second, the case does not resemble the three paradigms discussed at pp. 1508–

1509, *supra,* where courts find fraudulent conveyances based on 'actual intent to defraud.' The conveyance to B is open, not hidden from C. B is not a friend, relative, or other person 'specially connected' to S & K. The transfer does exchange a potentially liquid asset for an 'illiquid' one, but no more so than any other transfer to satisfy an antecedent debt; Mass.Gen.Laws ch. 109A, § 3 specifically cites satisfaction of an antecedent debt as "fair consideration," thus placing this sort of exchange outside the scope of the third paradigm. We would not treat the 'paradigms' as rigid rules, nor would we insist that all cases fall clearly into one of those categories. We find it significant, however, that this one does not resemble any of them.

Third, the case does resemble the fourth paradigm, a 'preference,' which Massachusetts courts (and most courts) have specifically held is *not* a fraudulent conveyance. *See,* pp. 1508–1509, *supra.* The debtors (S & K) prefer to satisfy a creditor (B) who seems far less worthy than another creditor (C), but both B & C are legitimate creditors of S & K.

Fourth, to find an actual intent to defraud creditors when, as in our example, an insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with a new function (determining *which* creditor is the more worthy). That determination may be easy to make in the case before us; there would undoubtedly be many other cases in which it would not be easy. Given the ability of bankruptcy courts to make just such determinations, 11 U.S.C. § 548 (1986); *see Smith v. Whitman,* 189 A.2d at 19 (preferences may be voided in bankruptcy proceedings, but not under fraudulent conveyance law); 1 G. Glenn, *supra,* § 289, we have no reason to believe Massachusetts would wish to make this change in its law.

Fifth, there is no need to expand fraudulent conveyance law in this way, for the cheated creditor C in the example normally could recover his money from B (the trans-feree) under other principles of law. C could point out that its officers, S & K (the transferors/debtors), have violated a fiduciary obligation (with B's knowledge) and it could ask for restitution of its funds from B. *See, e.g., Berry v. Kyes,* 304 Mass. 56, 22 N.E.2d 622 (1939). Alternatively, he could argue that S & K have converted his money (with B's knowledge) and, again, seek restitution. *See, e.g., Mickelson v. Barnet,* 390 Mass. 786, 790, 460 N.E.2d 566 (1984); *Commonwealth v. Hutchins,* 232 Mass. 285, 290–92, 122 N.E. 275 (1919). Given the presence of a suit of legal clothes that well fits the example, why try to recut a different suit made for a different kind of customer? (We do not express any view as to whether or not this particular plaintiff can recover under these principles, for we are writing here only about a general fact pattern.)

For these reasons, we believe the court correctly kept from the jury the Receiver's § 7 claim aimed at the transfers, by Shaw and Kepreos, in December 1981 and January 1982, of $473,000 to Burnazos.

■ 3. We now return to discuss a second, independent reason why the jury's § 4 ('constructive fraud') verdict (in respect to count 3) cannot stand. The reason concerns § 4's requirement that a plaintiff show not only that the transferor was insolvent but also that he tranferred the money either (a) without receiving a "fair equivalent" *or* (b) to a transferee who was not in "good faith." Mass. Gen.Laws ch. 109A, §§ 3 & 4. The jury indicated on the special verdict form that Burnazos was not in "good faith" (as to the December and January transfers), but the court refused to instruct the jury that a transfer that simply constituted a "preference" did not, by itself, constitute fraud or show lack of "good faith." Indeed, when Burnazos tried to argue this to the jury, the court told the jury that "that is not the law," and later said "preference has no place in ... this case." In context, we believe that without a "preference" instruction (or its equivalent) properly explaining the meaning of "good faith," the jury might well have based its finding simply upon its belief that

Burnazos obtained a preference when he knew that Shaw and Kepreos dishonestly took money from BTG; in our view, that fact, in and of itself, is not sufficient to show lack of "good faith."

We recognize that courts and commentators have had difficulty determining the meaning of "good faith" in § 3's definition of "fair consideration." *See generally* Note, "Good Faith and Fraudulent Conveyances," 97 Harv. L. Rev. 495 (1983). They have wondered what it adds to the other element of "fair consideration," namely the payment of a "fair equivalent." If a "fair equivalent" is paid, what could make the conveyance fraudulent (unless perhaps there is 'actual fraud' of some sort, in which case the plaintiff could proceed directly under § 7)? *See* Note at 506–08. Whatever "good faith" may mean, however, we believe it does not ordinarily refer to the transferee's knowledge of the *source* of the debtor's monies which the debtor obtained at the expense of other creditors. To find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of, dishonesty is to void the transaction because it amounts to a kind of 'preference'—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless. *See English v. Brown,* 229 F. 34 (3d Cir.1916) (transfer by insolvent to his wife in satisfaction of legitimate antecedent debt not fraudulent despite debtor's fraudulent intent and wife's knowledge thereof); 1 G. Glenn, *supra,* § 298a ("if all that has occurred is a preference, there is no fraudulent conveyance, regardless of the debtor's evil thoughts, and the grantee's knowledge upon that subject"); *cf. Traders' National Bank v. Steere,* 165 Mass. 389, 43 N.E. 187 (1896) (preference given to defrauded creditor to ensure his compliance in not reporting debtor to authorities not fraudulent as to creditors even though agreement not to inform was void as against public policy). And all the reasons that militate against finding a § 7 violation ('actual fraud') in such circumstances, *see* pp. 1510–1511, *su-*

*pra,* militate with at least equal force against finding a § 4 violation ('constructive fraud'). If, with all motives fully known, we would not find actual intent to defraud, what reason could there be for *presuming* fraudulent intent in such circumstances?

To say this is not to leave the words "good faith" without meaning. A court might refer to a lack of good faith, for example, where the transferee participates in the original dishonesty, say, by providing the debtor with goods that he uses to convince a creditor to advance new money, which he wrongfully intends to steal (though this might also violate § 7). *Cf. English v. Brown,* 229 F. at 34, 38–39 (discussing cases where conveyance was fraudulent, even though made for adequate consideration, because transferee participated in fraud and was therefore in bad faith); 1 G. Glenn, *supra,* § 298a. A court might also use the notion of "good faith" in ambiguous circumstances to help determine whether an exchange is for a "fair equivalent." Suppose, for example, an insolvent debtor, D, transfers property valued at $100,000 to C, one of his creditors, to satisfy an antecedent debt of $80,000. Depending on how narrowly one interprets "fair equivalent," such a transaction might be questionable, for it might be viewed as conveying $20,000 ($100,000 less $80,000) without equivalent value, at least if one looks at the transaction with benefit of hindsight. *Compare Hopkins v. Tinklepaugh,* 139 Misc. 127, 247 N.Y.Supp. 486 (1931) ($20,115 not a fair equivalent for property worth $23,000) *with Zellerbach Paper Company v. Valley National Bank,* 13 Ariz. App. 431, 477 P.2d 550 (1970) (any valuable consideration is a "fair equivalent" unless it is so unequal as to "startle a correct mind or shock the moral sense"). In such circumstances, C's 'state of mind,' his subjective appreciation of the situation, his 'good faith,' might help a court determine whether the exchange was a fair one, *i.e.,* how it should be viewed without hindsight. *See Mayors v. Commissioner of Internal Revenue,* 785 F.2d 757, 760–61 (9th Cir.1986) (finding "good

faith" where transferee honestly believed she had given a fair equivalent regardless of whether the contract was legally binding); 1 G. Glenn, *supra,* § 296 (arguing that the test is whether "the parties traded as persons might normally be expected to do"); *cf. Tacoma Association of Credit Men v. Lester,* 72 Wash.2d 453, 458, 433 P.2d 901, 904 (1967) (outlining a three-part test for good faith, the first part of which is whether the transferee honestly believes in the fairness of the deal). This is particularly true when volatile property, such as a commodities pool, is exchanged for cash. In hindsight, the consideration may seem unfair, but was it so at the time of the transaction? *See* 1 G. Glenn, *supra,* § 296 ("One must be able to conclude that there was bad faith as opposed to a tight trade.").

Suppose further that a debtor, D, on the verge of insolvency, pays $100,000 to buy a company's assets from T, assets that *might* be used to resuscitate D's fortunes, but which, in fact, fail to do so. Again, T's state of mind, his honest belief in the fairness of the deal at the time it was made might help a court determine whether or not this disastrous transaction, which ultimately injured D's creditors, was a fraudulent conveyance. *See* 1 G. Glenn, *supra,* § 296; *cf. id.,* § 298a.

Some state courts have offered expansive readings of the term "good faith," *see, e.g., Tacoma, supra; Southern Industries v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945 (1978) (invalidating a preferential transfer from an insolvent corporation to a director and major stockholder); *Sparkman & McLean Co. v. Derber,* 4 Wash. App. 341, 481 P.2d 585 (1971) (mortgage to attorney, who was working for corporation, to secure his fee deemed fraudulent where attorney knew or should have known that the work he was doing helped the insolvent corporation's officers "loot" corporate assets). The facts of the cited cases, however, fall considerably closer to the paradigms described at pp. 1508–1509, *supra,* (particularly the second paradigm) than those before us (where the only fraud concerns the *source* of the funds transferred, the transferee bore no special relationship to

the transferor, and the transferee did not participate in the fraud). We do not believe Massachusetts would interpret the phrase "good faith" expansively to apply it to our, still more distant, facts in light of the criticisms made of the expansive readings, *see* Note at 502–09 (1983), and in light of the Uniform State Law Commissioners' ratification of that criticism in recommending that states drop the phrase "good faith" from their statutes (though they would expand the definition of 'constructive fraud' in ways not directly relevant here). UFTA, 7A U.L.A. 639 (1985) (Commissioners' prefatory note).

For these reasons, the district court's decision not to give the "preference" instruction, or some functional equivalent, permitted the jury to base its verdict on a largely incorrect interpretation of the "good faith" provision of § 3. (The court defined "good faith" for the jury simply as knowledge of Shaw and Kepreos's fraudulent intent.)

4. Given our views thus far, one might wonder why a new trial is necessary on the Receiver's § 4 claim; why are the defendants not entitled to a verdict (on count 3) as a matter of law? The reason is that a properly instructed jury could find both (1) Shaw and Kepreos were insolvent at the relevant times, and (2) they did not receive "fair consideration" (§ 4) for the $473,000 they gave Burnazos because he did not give them a "fair equivalent" (§ 3). The "fair equivalent" for the $400,000 transfer was Burnazos's agreement to settle his lawsuit against Shaw and Kepreos. The "fair equivalent" for the $73,000 installment was a portion of the value of BTG itself.

The "fair equivalent" question in respect to the settlement of the state court lawsuit is whether the settlement was worth the $400,000 Shaw and Kepreos paid for it. The lawsuit charged that Shaw and Kepreos (and BTG and NIS) had destroyed the value of Burnazos's collateral, namely, the assets of BTG and NIS, which assets guaranteed payment of the more than $1 million that Shaw and Kepreos still owed Burnazos as payment for BTG. On the one hand, the

Receiver argues the settlement was not worth the price. He says that BTG was worth far less than its original selling price of $1.6 million. He has argued that the initial sale may have violated a duty Burnazos owed to BTG. If so, Burnazos might have lost the subsequent lawsuit, and the settlement may not have been worth the money paid for it. On the other hand, Burnazos argues that BTG was at least valuable enough to make the sale contract legally binding; that being so, he says, the subsequent lawsuit was well founded; and, in that case, settlement of the suit for $400,000 was reasonable and a "fair equivalent." In our view, this matter of the value of the settlement, like the issue of solvency, is an issue of fact that the record does not resolve. *Cf. Schlecht v. Schlecht*, 168 Minn. 168, 172, 209 N.W. 883 (1926), *quoted in Bianco v. Lay*, 313 Mass. 444, 445, 48 N.E.2d 36 (1943) (finding fair consideration when an insolvent transferor assigned part of the potential proceeds of a lawsuit to a creditor to satisfy a $500 debt, and the assignment wound up being worth $4300; the court emphasized that the value of the lawsuit was uncertain when the deal was made).

Whether Burnazos gave a "fair equivalent" for the $73,000 installment is impossible to determine from the present record. We do not know what the jury thought because the special verdict interrogatory lumped the $73,000 installment payment and the $400,000 settlement together even though the consideration that Burnazos gave for each was quite different. We know the jury awarded the Receiver $436,000 although a full award would have amounted to $473,000. The actual award for the Receiver in the jury's mind could have consisted of (1) half the installment plus all the settlement, (2) all the installment, and part of the settlement, or (3) part (but more than half) of the installment and part of the settlement. On retrial, the two transfers should be separated.

### B. *BTG's Commodity Pool Investors as Creditors; BTG as Transferor*

■ We turn now to the Receiver's count 4 theory, in which BTG is the credi-

tor that owed money to the investors in its commodity pools and transferred the money to Burnazos. These investors are the "defrauded" creditors, and the Receiver seeks their money back from Burnazos, the transferee. The Receiver claimed the $73,000 installment and the $400,000 settlement transfers violated both § 7 and § 4. In our view, a verdict for the Receiver under either statutory provision is legally improper because in count 4, the Receiver is suing not on behalf of BTG itself, but solely on behalf of the investors in BTG's commodity pools, and the Receiver lacks the legal authority to bring this kind of suit.

The Receiver draws his authority to sue from a court order that gives him "full power to prosecute all claims ... *on behalf of NIS and BTG.*" (Emphasis added.) It does not give him authority to prosecute claims on behalf of BTG's or NIS's creditors. The Fraudulent Conveyance Act gives rights only to "creditors" to set aside conveyances that defrauded them. Mass. Gen.Laws. ch. 109A, § 9. And, count 4 of the complaint involves only the claims of BTG's creditors to set aside a conveyance made by BTG, which conveyance, it says, defrauded *them*. It is only *their* legal claims, not those of BTG, that are here at issue.

The district court (through a different judge in a related case) held that the Supreme Court decision *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) compels the conclusion that, under these circumstances, the Receiver lacks authority to assert the kind of claim presented in count 4. *BTG, Inc. v. 1st Pullen Commodity Services, Inc.*, No. 83–0499–Z (D. Mass. Nov. 29, 1983). We believe that district court determination is legally correct and applicable here.

In *Caplin*, a 'trustee in reorganization' (a trustee appointed under the legal authority of Chapter X of the old Bankruptcy Act, 52 Stat. 883 (1938), *replaced by* Bankruptcy Act of 1978, 92 Stat. 2549) tried, on behalf of the bondholders of a company called Webb & Knapp, to sue an 'indenture trustee' for 'breach of duty.' (The 'indenture

trustee' was supposed to make certain Webb & Knapp maintained enough assets both to pay its bills and to pay off its bonds.) The Supreme Court wrote that the bondholders themselves might sue the 'indenture trustee,' but Webb & Knapp's 'trustee in reorganization' could not, for three reasons.

First, the statute under which the trustee was appointed empowered him to "collect and reduce to money the property of *the estate* for which" he is trustee, *i.e., Webb & Knapp's* property; it did not authorize him to collect the property of *those who had invested* in Webb & Knapp. *Caplin,* 406 U.S. at 429, 92 S.Ct. at 1685 (quoting 11 U.S.C. § 75 (1970), *replaced by* 11 U.S.C. § 704 (1982)). (Emphasis added.) Second, the bondholders could bring their own action, through a class action, if necessary. The Trustee's suit on their behalf was not needed to benefit them and (for technical reasons) it was unlikely to benefit any other creditor of, or investor in, Webb & Knapp. *Id.* at 431–34, 92 S.Ct. at 1186–88. Third, to permit the trustee to bring the bondholders' claims threatened to raise a host of complex legal issues involving such matters as whether he could represent fairly (and the extent to which his actions bound) bondholders who might wish to bring their own suits. *Id.*

We can find no relevant distinction between *Caplin* and the case before us. The Receiver here, like the trustee in *Caplin,* derives his authority from federal law. The *Caplin* court expressly analogized the 'trustee in reorganization' to a receiver in equity. 406 U.S. at 429, 92 S.Ct. at 1685. The authorizing instrument here, like the statute in *Caplin,* refers to the *companies'* claims; it does not refer either specifically or generally to claims of BTG's or NIS's investors, creditors, or those who gave the companies money to manage. *Cf.* 1 G. Glenn, *supra,* § 103 at 204. Further, there seems no obvious need for the Receiver to bring this action on behalf of these investors. The Receiver has not explained why they could not bring their own claims, through a class action, if necessary.

Finally, here, as in *Caplin,* a receiver's suit on behalf of these creditors could raise complex issues unnecessarily, for the interests of BTG and its creditors may conflict. Under fraudulent conveyance law, an individual creditor bringing suit could satisfy his *entire* claim out of the assets recovered; the Receiver, however, would simply add any award he wins to the company's coffers for pro rata distribution among all creditors. *See* Clark, *supra,* 514–15 & n. 33 (fraudulent conveyance law rewards the "swiftest of wing"). Thus, any individual BTG creditor (or any group of creditors smaller than the set of all BTG's creditors) might fare better by bringing suit than by relying on the Receiver. Moreover, would it be fair to require these creditors to share the proceeds of what is in effect their lawsuit with other creditors, who, say, became creditors after the transfers took place? These potential difficulties suggest to us that the legal complexities here are similar enough to those involved in *Caplin* that, in light of the other similarities, we must reach a similar result.

The Receiver refers us to a district court case, *Lank v. New York Stock Exchange,* 405 F.Supp. 1031 (S.D.N.Y.1975), which, he correctly points out, permitted a receiver to sue for damages the corporation's officers had caused in circumstances where the corporation (which was *in pari delicto* ) could not recover. But, unfortunately for the Receiver's argument, the damages that *Lank* permitted the receiver to recover were nonetheless those suffered by the *corporation,* not those suffered exclusively by its creditors. The court wrote:

> It is well settled, for instance, that where a corporation has transferred funds in fraud of its creditors, the receiver may maintain an action against persons to whom the transfers were made to enforce the rights of the corporation *and its creditors* and recover the funds even though the corporation could not do so.... It is in this sense, and only in this sense, that a receiver is said to "represent not alone the corporation ... but as well the interests of all creditors."

*Id.* at 1037 (quoting *Keedy v. Sterling Electric Appliance Co.,* 13 Del. Ch. 66, 115

A. 359, 363 (1921)) (emphasis added). The underlined words "and its creditors" support the Receiver's argument. But, the court went on to note,

> This is not inconsistent with our conclusion that Lank [the receiver] *may not sue to collect the damages sustained by the creditors.* He 'represents' these third parties' interests not by suing on their claims ... but by suing to recover *corporate damages....* [H]e is attempting to maximize the pool of corporate assets in order to satisfy the corporation's obligations to the greatest extent possible.

*Id.* (emphasis added); *cf. McCandless v. Furlaud,* 296 U.S. 140, 166–67, 56 S.Ct. 41, 50, 80 L.Ed. 121 (1935) ("the receiver does not claim to have succeeded to the rights of bondholders ... [but challenges] the unlawful depletion of the [company's] assets"). The italicized language hurts the Receiver here because in count 4 (where BTG is the debtor/transferor, and the pool investors are the defrauded creditors) the damages suffered are those sustained by the pool investors, *not* the corporation. *Lank* does not permit suits for damages suffered *only* by a corporation's creditors when the authorizing document permits suit only for damages suffered by the corporation. Regardless, even if *Lank* were more directly on point, we would have to follow the Supreme Court case, *Caplin.*

We recognize that the pool investors arguably have a valid fraudulent conveyance claim, particularly with regard to the $400,000 settlement. If BTG (on this theory, the debtor/transferor) transferred this money, the § 4 ('constructive fraud') issue would be whether *BTG* (not Shaw and Kepreos) received a "fair equivalent" for the $400,000 settlement. Was settlement of the state court lawsuit worth the "equivalent" of $400,000 to *BTG?* The § 7 ('actual fraud') question would focus on whether BTG, in transferring its own $400,000 to Burnazos in settlement of the suit, relieved its officers Shaw and Kepreos of a financial burden they would otherwise have had to bear. If BTG relieved them of this burden at the expense of its own creditors, has it improperly favored its 'friends' Shaw and Kepreos over its creditors? Has it acted 'generously' rather than 'justly?' *See* p. 1508, *supra; see also Stuart v. Larson,* 298 F. 223 (8th Cir.1924) (preferences given by insolvent corporations to insiders are fraudulent); *In re Lamie Chemical Co.,* 296 F. 24 (4th Cir.1924) (same); *Tacoma Association of Credit Men v. Lester,* 72 Wash.2d 453, 459, 433 P.2d 901, 905 (1967) (same); UFTA § 5, 7A U.L.A 657–58 (1985) (recommending a statutory revision that suggests that such a conveyance is fraudulent).

Perhaps, if the Receiver had requested authorization to bring such a suit, the district court would have granted it (or would do so now). We express no opinion on the lawfulness or the desirability of any such expanded authority; we simply find that the authorizing language, in its present form, given *Caplin,* does not now permit the Receiver to assert the claims contained in count 4.

### III

### *The $400,000 Down Payment*

The Receiver, acting in his capacity as receiver of NIS, argued that the $400,000 down payment, made for the purchase of BTG in October 1981, amounted to a fraudulent conveyance. As in the case of the later transfers, the Receiver asserted two different theories. In count 6, he claimed that Shaw and Kepreos were the debtors who transferred money to Burnazos, defrauding their creditor NIS. In count 7, the Receiver claimed that NIS was the debtor/transferor and the pool investors the 'defrauded' creditors. In each count, the Receiver claimed that the transfer violated both § 7 ('actual fraud') and § 4 ('constructive fraud'). The district court refused to send either § 7 claim to the jury. The jury considered both § 4 claims, and found in Burnazos's favor. It found that the October 1981 down payment, whether made by NIS or by Shaw and Kepreos, was for a "fair equivalent" and that Burnazos was in "good faith"; hence, the transfer did not violate § 4. The Receiver now appeals only the district court's decision not

to permit the jury to decide the § 7 issues. In our view, the district court was correct.

The court was correct in refusing to permit the jury to consider the claimed § 7 violation in respect to the Receiver's first theory (viewing Shaw and Kepreos as the debtors/transferors) for the reasons we set forth in discussing the parallel BTG-related claim at pp. 1510–1511, *supra*. That is to say, the only 'fraud' shown in respect to Shaw and Kepreos concerns the *source* of the debt to NIS, not the *transfer* to Burnazos. That kind of fraud—dishonesty in the *creation* of the debt—is (in the circumstances present here) not the kind of fraud that the Act addresses. It is not sufficient to constitute a § 7 violation, and we can find here no additional circumstances that might create a jury issue in respect to this § 7 claim.

The district court was correct in refusing to permit the jury to consider the claimed § 7 violation in respect to the Receiver's second theory (treating NIS as the debtor/transferor) for reasons we set forth in discussing the parallel BTG-related claim at pp. 1514–1516, *supra*. For similar reasons, the Receiver lacked the legal authority to set forth the 'fraudulent conveyance' claims of NIS's investors and creditors.

## IV

### Remaining Claims and Issues

■ The Receiver argues that the trial court incorrectly dismissed a further claim (counts 1 and 2) that Burnazos, knowing that Shaw and Kepreos were dishonest and would likely loot BTG, violated his fiduciary duty to the corporation by selling BTG to them in October 1981. He argues that a receiver may assert such a claim on behalf of *both* a corporation and its creditors or investors. *See Lank, supra*. The Receiver, however, misunderstands the basis of the district court's dismissal. The court did not hold that the Receiver lacked the legal authority to bring a claim alleging that Burnazos breached a duty to the corporation; rather, it held that counts 1 and 2 simply did not assert any such claim.

We concede that count 1 is *entitled* "Breach of Fiduciary Duty—Damages Incurred *by BTG* and Clients," (emphasis added). But, count one nowhere else refers to injury to BTG. Rather, count one says that the breach consisted of (1) Burnazos's selling BTG "without informing BTG's clients," (2) his selling BTG "in total disregard of the interests of BTG's clients," and (3) his causing "the clients of BTG ... to lose $4,000,000." The district court told the Receiver that this count as written only alleged harm to the clients, not to BTG, and he therefore dismissed it. The Receiver might have amended the count, but he did not do so.

Like the district court, we see in count one no allegation of a breach of duty to BTG that harmed BTG. The Receiver may represent the interests of the creditors by seeking to recover *corporate* damages, but he lacks the authority to seek redress for harm suffered *only* by the creditors. *See* pp. 1514–1516, *supra*. Count 2 simply asserts that Burnazos sold BTG for more than it was worth, without setting forth any legal theory explaining how that fact might have violated a fiduciary obligation to BTG. We therefore believe that dismissal of both counts was legally proper.

In light of our disposition of this case, we need not reach the parties' remaining arguments.

*The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.*

## APPENDIX

### CHAPTER 109A

**FRAUDULENT TRANSFERS OF REAL AND PERSONAL PROPERTY**

Sec.
1. Definitions.
2. Insolvency; person; partnership.
3. Fair consideration.
4. Conveyances of insolvent.
5. Conveyances by persons engaged in or about to engage in business.

6. Conveyances by person about to incur debts beyond ability to pay.

7. Conveyances made with intent to defraud.

8. Conveyance of partnership property.

9. Rights of creditors; matured claims.

10. Rights of creditors; immature claims.

11. Application of rules of law and equity.

12. Interpretation and construction.

13. Citation; uniform fraudulent conveyance law.

**§ 1. Definitions.** In this chapter "Assets" of a debtor means property not exempt from liability for his debts. To the extent that any property is liable for any debts of the debtor, such property shall be included in his assets.

"Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.

"Creditor" is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

"Debt" includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

**§ 2. Insolvency; person; partnership.** (1) A person is insolvent within the meaning of this chapter when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

(2) In determining whether a partnership is insolvent within the meaning of this chapter there shall be added to the partnership property the present fair salable value of the separate assets of each general partner in excess of the amount probably sufficient to meet the claims of his separate creditors, and also the amount of any unpaid subscription to the partnership of each limited partner, provided the present fair salable value of the assets of such limited partner is probably sufficient to pay his debts, including such unpaid subscription.

**§ 3. Fair consideration.** Fair consideration is given for property or obligation—

(*a*) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied or

(*b*) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

**§ 4. Conveyances by insolvent.** Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

**§ 5. Conveyances by persons engaged in or about to engage in business.** Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction, for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

**§ 6. Conveyances by person about to incur debts beyond ability to pay.** Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors.

**§ 7. Conveyances made with intent to defraud.** Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

**§ 8. Conveyance of partnership property.** Every conveyance of partnership property and every partnership obligation in-

curred when the partnership is or will be thereby rendered insolvent, is fraudulent as to partnership creditors, if the conveyance is made or obligation is incurred—

(*a*) To a partner, whether with or without a promise by him to pay partnership debts, or

(*b*) To a person not a partner without fair consideration to the partnership as distinguished from consideration to the individual partners.

**§ 9. Rights of creditors; matured claims.** (1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser—

(*a*) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

(*b*) Disregard the conveyance and attach or levy execution upon the property conveyed.

(2) A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation may retain the property or obligation as security for repayment.

**§ 10. Rights of creditors; immature claims.** Where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured, he may proceed in the supreme judicial or superior court against any person against whom he could have proceeded had his claim matured, and the court may—

(*a*) Restrain the defendant from disposing of his property,

(*b*) Appoint a receiver to take charge of the property,

(*c*) Set aside the conveyance or annul the obligation, or

(*d*) Make any order which the circumstances of the case may require.

**§ 11. Application of rules of law and equity.** In any case not provided for in this chapter the rules of law and equity, including the law merchant, and in particular the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy or other invalidating cause shall govern.

**§ 12. Interpretation and construction.** This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

**§ 13. Citation; uniform fraudulent conveyance law.** This chapter may be cited as the uniform fraudulent conveyance law.