[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals
## For the First Circuit

---

No. 00-1245

C. GERARD MILLER,

Plaintiff, Appellee,

v.

CHARLES E. HARDING, JR.,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Torruella, Chief Judge,
Stahl and Lipez, Circuit Judges.

---

Jeffrey N. Roy with whom Ravech & Roy, P.C. was on brief for appellant.
Gerry D'Ambrosio for appellee.

---

DECEMBER 5, 2000

---

**Per Curiam**.  Charles Harding, the defendant, appeals a district court order denying his motion for summary judgment and granting that of the plaintiff, Gerard Miller.  Miller had sued Harding for being the recipient of a fraudulent conveyance from a third party, Keith Dominick, the operator of a Ponzi scheme.[1]  Because Harding has not raised, and thus has waived, the one argument that could merit a reversal, we affirm.

## I. BACKGROUND

The following facts have been drawn from the district court's opinion in this case, as well as from CFTC v. Dominick, 1996 WL 406833 (M.D. Fla. 1996).

Keith Dominick operated his Ponzi investment scheme from February 1992 through April 1994.  During that time, he took investments from approximately 70 pool participants, adding up to a total of $5.9 million.  He represented to these investors that their money was to be invested in the commodities market, and that they would receive very high returns.  Over the course of those years, Dominick in fact invested only about $2

---

[1] A Ponzi scheme is a fraudulent investment strategy wherein early investors are paid phony returns using later investors' money.  These returns, which tend to be unusually high, serve as a marketing tool to lure in new investors.  Little, if any, of the money ever gets invested as promised, and the scheming pool operator embezzles much of it.  Dominick ran such a scheme from early 1992 through April 1994.  He did so by selling shares in an investment company he had acquired to implement the ruse.

million of the $5.9 million he attracted. The remainder was either dispersed to early investors as a spur to attract new business, or embezzled for his own needs (including the purchase of his home and the payment of his federal taxes, among other things). On September 14, 1993, in furtherance of his activities, Dominick acquired Main Street Investment Group, Inc. [hereinafter "Main Street" or the "corporation"]. After that date, he conducted his investment/Ponzi scheme through that entity.

Harding made all of his investments between September and December, 1992. During that period, he invested a total of $185,000. Subsequently, over the period of time from December 1992 through February 1994, he received "returns" on his investment totaling $497,000. In November 1993, Miller, a lawyer, purchased 5,000 shares in Main Street at a cost of $200 per share, for a total of $1 million. He received one return on his investment, $3,500 in the form of a wire transfer to a third party made at his request, but lost the remaining $996,500 entirely. In April 1994, Miller reported what he believed to be suspicious activity by Main Street and Dominick to the FBI and the CFTC. On June 15, 1994, the CFTC filed a complaint against Dominick and Main Street in the United States District Court for the Middle District of Florida, alleging violations of the

-4-

Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. As a result of that filing, an equity receiver for both Main Street and Dominick was appointed. The receiver was granted very broad powers with respect to Dominick and Main Street.[2]

The equity receiver demanded $312,000 from Harding, representing the difference between Harding's investment and his return. Ultimately, Harding settled with the receiver for $215,000. Later, in the United States District Court for the District of Massachusetts, Miller sued Harding for $97,000, the remainder of his profit, on the basis that this sum had been fraudulently conveyed to Harding by Dominick, a tort debtor of

---

[2] The equity receiver was granted the power to take over Dominick's and Main Street's assets, including funds of investors, and to

> investigate the assets, liabilities, transfers of real and personal property, commodity trading activity and commodity pool operation of defendants Dominick and Main Street and institute such actions and legal proceedings as the Receiver deems necessary against individuals, corporations, partnerships, associations or unincorporated organizations for the purpose of recovering funds or property of defendants Dominick and Main Street, including funds of investors, which the Receiver may claim to be wrongfully or improperly in the possession, custody or control of others.

CFTC v. Dominick, No. 94-661-CIV-ORL-18 (M.D. Fla. July 15, 1994) (agreed order of preliminary injunction and appointment of receiver). The equity receiver was to represent the interests of the corporation and its investors.

Miller.[3]  Harding defended on the ground that Miller's claim involved harm to the corporation, and thus belonged to the equity receiver, who had already settled it.  Harding did not respond to Miller's argument that he was suing on the basis of a transfer from Dominick, as his tort debtor, and not one from the corporation.  The district court granted summary judgment to Miller and denied it to Harding, awarding Miller $97,000.  This appeal followed.

---

[3] Miller is a tort creditor of Dominick on the basis of Miller's claim for fraud in the inducement.  Miller obtained a default judgment against Dominick for this tort on May 7, 1997, but Dominick was judgment-proof.

## II. DISCUSSION

An equity receiver, like a bankruptcy trustee, has standing for all claims that would belong to the entity in receivership, and which would thus benefit its creditors and investors, but no standing to represent the creditors and investors in their individual claims. See Scholes v. Lehmann, 56 F.3d 750, 753 (7th Cir. 1995) (addressing this issue in a Ponzi scheme receivership case); see also Fisher v. Apostolou, 155 F.3d 876, 879 (7th Cir. 1998) (making the same observation in a bankruptcy case). For this reason, Miller's only possible claim against Harding is for a fraudulent conveyance from Dominick himself, as an individual tort debtor to Miller, and not for a fraudulent conveyance from the corporation in which Miller had invested. The latter claim belonged to the receiver, who has already settled it. We shall thus consider Miller's complaint only to the extent that it is based on the former theory and not the latter.

Miller's complaint did not properly allege a fraudulent conveyance. We have described the nature of an appropriate fraudulent conveyance claim by setting out the three paradigm examples. See Boston Trading Group, Inc. v. Burnazos, 835 F.2d 1504, 1508 (1st Cir. 1987). In all three examples the debtor transferred his own funds to someone else in an effort to avoid

payment to his creditors. See id. Because the creditor's claim is against the transferor of the funds, the only money to consider is that which in fact belongs (or belonged, prior to the transfer) to the debtor.

In his own complaint, however, Miller makes it clear that the monies transferred to Harding never did rightfully belong to Dominick. The gravamen of Miller's allegations is that, with respect to both his investments and the investments of others, Dominick wrongfully diverted funds earmarked for investment in the commodities market to his own use or to early investors in the Ponzi scheme (such as Harding). By accusing Dominick of wrongfully siphoning funds for his own use, Miller unwittingly acknowledges the defect in his claim. The complaint thus fails to set forth an essential element of Miller's claim against Harding: that the $97,000 sought in this lawsuit ever belonged to Dominick.

Unfortunately, however, Harding has failed to appreciate the nature of Miller's claim from beginning to end, and thus has not responded to it. In the district court, and now again on appeal, Harding missed the essential theory of Miller's case: that, as the victim of Dominick's fraudulent inducement, he (Miller) was a tort creditor of Dominick's since the time of his investment. Absent the key defect we have

-8-

pointed out, this could be the basis for a valid claim of fraudulent conveyance. Harding thus overlooked the fact that this was a separate claim that belonged to Miller, and not to the corporation, and failed to defend himself against it by pointing out the defect. As a result of this oversight, some of Harding's appellate arguments, like his summary judgment arguments, are entirely beside the point.

There are, however, three arguments presented by Harding which, if we were to accept, would provide bases for overturning the district court's judgment in favor of Miller: (1) that Miller is collaterally estopped from relitigating the question of Harding's total liability; (2) that there was adequate consideration for the transfer; and (3) that the district court misinterpreted the definition of "creditor" under fraudulent transfer law. On the latter two issues, which go to the merits of Miller's claim, we adopt the reasoning of the district court and affirm on those bases. As to collateral estoppel, however, we differ with the district court's holding that Miller and the receiver lack privity and that Miller did not have a full and fair opportunity to litigate whether the $97,000 sought in this lawsuit was fraudulently transferred. The fact remains, however, that the Florida proceedings are not yet final, and the equity receiver's settlement with Harding is

still susceptible of being set aside.  Collateral estoppel thus cannot apply.  See Biggins v. Hazen Paper Co., 111 F.3d 205,209 (1st Cir. 1997) ("Collateral estoppel, now often called issue preclusion, prevents a party from relitigating at a second trial issues determined between the same parties by an earlier final judgment . . .").

Although Harding may not have achieved the result he expected when he settled with the equity receiver, that is due to his failure to controvert the claim that Miller has made against him in this action.  As a policy matter, individuals in Harding's position should be able to settle with receivers without fear of this sort of litigation.  Because Miller's success in this case is due Harding's waiver of the proper defense, we do not expect that it will encourage future actions among parties similarly situated to those here.

Accordingly, and with some reticence, the opinion below is AFFIRMED.  No costs.