In re SHARP INTERNATIONAL CORP., and Sharp Sales Corp., Debtors.

Sharp International Corp., Plaintiff,

v.

State Street Bank and Trust Company, Defendant.

Bankruptcy Nos. 99–21317–608, 99–23347–608.

Adversary No. 01–1439 (CEC).

No. 02–CV–5306 (DGT).

United States District Court, E.D. New York.

Dec. 5, 2003.

Kramer Levin Naftalis Frankel LLP, New York City, for Debtors.

James C. McCarroll, Kramer, Levin, Naftalis & Frankel, LLP, New York City, for Trustee.

Bingham McCutchen, New York City, Jonathan B. Alter, Bingham, McCutchen LLP, Hartford, CT, for Creditor Committee.

Scott D. Corrigan, Peter Neil Wang, Freidman, Wang & Bleiberg, PC, New York City, for Plaintiff/Appellant.

Michael R. Young, Willkie, Farr & Gallagher, LLP, New York City, for Defendant.

Kelley Drye, Neil Matthew Merkl, Kelley, Drye & Warren, LLP, New York City, for Appellee.

*Memorandum and Order*

TRAGER, District Judge.

Plaintiff–Appellant Sharp International Corp. ("Sharp") appeals an order of the Bankruptcy Court for the Eastern District of New York (Craig, J.), dismissing in its entirety an adversary complaint filed by Sharp against its former secured lender, State Street Bank and Trust Company ("State Street"). The complaint asserts a claim against State Street under New York common law for aiding and abetting Sharp's three officers in breaching their fiduciary duties to the company. Sharp further claims that a $12 million payment Sharp made to State Street in April 1999 in satisfaction of a valid antecedent debt is avoidable as a constructive and/or intentional fraudulent conveyance pursuant to New York Debtor & Creditor Law (the "D.C.L.") §§ 273–276. Lastly, Sharp asserts that any claim State Street may subsequently raise by virtue of its return of the $12 million payment—if such relief were to be ordered—should be equitably subordinated to the claims of Sharp's other unsecured creditors.

## Background

### (1)

Sharp is a closely-held New York corporation, which, at all times relevant to this case, was engaged primarily in the business of importing, assembling and distributing wrist watches, clocks, pens and mechanical pencils. *See* Compl. ¶¶ 5, 9. This adversary proceeding arises out of a massive fraud against Sharp and its creditors perpetuated by Sharp's former officers, Herbert, Lawrence, and Bernard Spitz (the "Spitzes").

In 1993, the Spitzes purchased 100 percent of Sharp's common stock. From then until October 1999, the Spitzes served as Sharp's sole officers, with responsibility

over Sharp's day-to-day affairs.[1] *See id.* ¶ 10. In January 1995, the Spitzes sold a 13 percent ownership interest in Sharp to an outside investor, Bohoradzaner, Inc. Pursuant to agreements executed in connection with this sale, Bohoradzaner, Inc. had "the right to a seat on Sharp's Board of Directors, the right to inspect Sharp's books and records, the right to veto certain corporate transactions, and a variety of other corporate governance rights." *Id.* ¶ 11. Jaime Bohoradzaner, the principal of Bohoradzaner, Inc., served as a member of Sharp's Board of Directors from January 1995 until October 1999. *See id.* Sharp alleges that "[n]either Bohoradzaner, Inc. nor Mr. Bohoradzaner played any role in, or had any knowledge of, the fraud and embezzlement committed by the Spitzes." *Id.*

The Spitzes' fraud had two basic components. First, beginning some time prior to 1997 and continuing until October 1999, the Spitzes fraudulently inflated Sharp's reported sales and revenues and used these falsified financial statements "to raise increasingly large sums of money from a succession of banks and other lenders." [2] *Id.* ¶ 15. At the same time, the Spitzes looted Sharp of the funds they caused it to fraudulently raise, as well as other corporate funds. *See id.* ¶ 16. In 1998 and 1999 alone, the Spitzes stole more than $44 million from Sharp, diverting the funds to a variety of companies, most of which were owned by or otherwise affiliated with the Spitzes, and which pro-vided no consideration to Sharp in exchange for the transfers. *See id.*

State Street's relationship with Sharp (and the Spitzes) commenced in November 1996, when State Street approved a $20 million demand line of credit to Sharp—secured by Sharp's assets—to refinance Sharp's then-current debt with LaSalle Bank and to support Sharp's operations. *See id.* ¶ 17. The terms of State Street's loan to Sharp were formalized in a Credit Agreement and a Security Agreement, both of which were dated December 12, 1996. *See id.* ¶ 18. The $20 million credit limit notwithstanding, State Street permitted Sharp's indebtedness to rise to approximately $26 million in 1997. *See id.* ¶ 19. In July 1998, the Spitzes raised $17.5 million through the issuance of subordinated notes to a group of investors (the "Noteholders"). *See id.* ¶ 15. Sharp subsequently used a portion of the July 1998 proceeds to pay down the debt to State Street. Thus, by the fall of 1998, the State Street debt had been reduced to $15 million. *See id.* ¶ 19.

Sharp alleges that State Street began to suspect the possibility of the Spitzes' fraud some time during the summer of 1998, when Sharp breached its loan agreement in numerous respects. In particular,

> Sharp failed and refused to provide State Street with borrowing base reports, detailed accounts receivable aged trial balances, and other documentation, as required by the Credit and Security Agreements, despite State Street's con-

---

1. Specifically, Bernard Spitz served as Sharp's Chief Executive Officer, Herbert Spitz served as President, and Lawrence Spitz was Chief Financial Officer. *See id.* ¶ 10.

2. So great was the scope of the fraud that "[t]he great majority of Sharp's reported accounts receivable balances during fiscal 1997, 1998, and 1999 was comprised of fictitious sales," including reported sales to fictitious customers and fictitious sales to actual customers. *Id.* ¶ 13. The Spitzes reported Sharp's net sales to be $52.1 million in 1997 (when its actual sales for that year were approximately $24 million), $80.2 million in 1998 (when actual sales were approximately $21 million), and $118.1 million in 1999 (when actual sales were approximately $19 million). *See id.* ¶ 14.

stant requests for such information; Sharp failed and refused to implement an accounting system that would generate monthly financial statements, despite Sharp's prior agreement to do so; and Sharp refused to utilize the State Street lockbox account, through which, pursuant to the parties' Agreements, Sharp's account receivables were required to flow. *Id.* ¶ 31. Moreover, based on the documentation that Sharp did furnish, State Street grew concerned that Sharp was growing at an "alarmingly rapid pace" and was consuming a large amount of cash. *Id.* ¶ 32.

Sharp contends that State Street's sensitivity to this kind of behavior was "heightened" as a result of a fraud it had discovered at another of its borrowers, PT Imports, with whom State Street developed a lending relationship in 1993. *See id.* ¶¶ 21, 28. During the summer of 1998, State Street determined that PT Imports had "created fictitious accounts receivable and customers, had created fictitious purchase records, and had falsely identified vendors who did not exist." *Id.* ¶ 25. State Street concluded this fraud "had directly caused it to lend large amounts of money to PT Imports." *Id.* Accordingly, in June 1998, State Street commenced an action against PT Imports in New York State court, seeking damages in excess of $19 million. *See id.* ¶ 26. Like the loan to Sharp, the PT Imports loan was made for the purpose of refinancing a debt to LaSalle Bank. *See id.* ¶¶ 17, 21. Furthermore, both Sharp and PT Imports had dealings with another Brooklyn-based entity, named Kent International, whose "principals had fraudulently inflated the company's net sales figures by creating false sales with related real customers and fictitious customers." *Id.* ¶ 27.

In the fall of 1998, despite the fact that the Sharp loan was current, well within line limits, and—based on Sharp's reported financial condition, appeared to be oversecured—State Street took various actions that demonstrated its mounting concerns regarding the Sharp loan. That September, Nancy Loucks ("Loucks"), a Senior Vice President and Credit Risk Officer at State Street, who had also had oversight responsibility for State Street's lending relationship with PT Imports, assigned James Benninger ("Benninger") from State Street's loan workout department to assist with the Sharp credit. *See id.* ¶ 33. Charles Glerum ("Glerum"), outside counsel specializing in troubled loans, was also put on the case. *See id.* Loucks has admitted that she "devoted more time to the Sharp credit than to any other credit on which she worked throughout the summer and fall of 1998, even though Sharp was not in monetary default during this time period." *Id.* ¶ 37. Loucks further alerted a number of high-level State Street officials of her concerns. *See id.*

On two separate occasions, State Street took the "unusual step" of contacting several of Sharp's largest customers to confirm that they were, in fact, purchasing products from Sharp. *See id.* ¶ 38. In early October, State Street sent letters to Sharp seeking information from Sharp regarding its largest customers and requesting access to Sharp's facilities to conduct a physical inventory count. *See id.* ¶ 39. State Street also requested the work papers of Sharp's outside auditor, KPMG Peat Marwick ("KPMG"), in connection with the audit it had done for the fiscal year ending March 31, 1998. *See id.* ¶ 40.

On October 22, 1998, State Street's outside counsel retained First Security Services Corporation ("First Security"), a firm specializing in investigating financial fraud, to conduct a formal investigation of Sharp. *See id.* ¶ 41. Sharp alleges on information

and belief that the purpose of the investigation was to determine whether fraud was being committed by Sharp and whether State Street had any legal claims against Sharp as a result. *See id.* On November 3, 1998, First Security produced a 60-page report relaying the results of its investigation, which was reviewed by State Street's outside counsel, Loucks, and other high-level officials at State Street. "Loucks has admitted that this report further heightened her concerns of fraud at Sharp." *Id.* ¶ 42.

On November 4, 1998, State Street representatives met with the Spitzes at Sharp's facilities. State Street indicated its intent to conduct formal confirmations of Sharp's receivables with the aid of Sharp's auditor, KPMG. Sharp refused to consent to these confirmations and further instructed State Street not to involve KPMG, fearing that its auditor might be "spooked" by such an inquiry. *See id.* ¶ 43.

On November 6, 1998, Benninger, the loan workout specialist assigned to the Sharp credit, requested that he be provided copies of Sharp checks that had passed through State Street's demand deposit account. Benninger reviewed the checks in order to identify the parties with whom Sharp was doing business and to determine whether Sharp had made any substantial payments to the Spitzes. *See id.* ¶ 45. Two weeks later, on or about November 20, 1998, Benninger had additional checks pulled and reviewed them for the same purpose. *See id.* The complaint does not indicate what, if anything, was revealed by these inquiries.

Several days later, a team of State Street field auditors made a scheduled visit to the Sharp facility in order to review Sharp's detailed accounts receivable statement and cash receipts. However, despite its prior agreement to do so, Sharp refused to make this information available to the State Street personnel. *See id.* ¶ 46. Eventually, in response to another letter from State Street demanding access to this information, Sharp provided State Street "gross numbers, without any backup." *Id.*

Sharp alleges that State Street's investigative efforts culminated on November 18, 1998, when Loucks obtained Dun & Bradstreet reports (the "D & B Reports") on 18 of Sharp's reported customers. According to Sharp, the D & B Reports "contained sufficient disclosures to afford [Loucks] the knowledge that Sharp had fraudulently created fictitious customers and accounts receivable." *Id.* ¶ 47. More specifically, the D & B Reports showed that "one supposed Sharp customer had no known address, another had gone out of business in 1991, and a number of others—to which Sharp reported selling millions of dollars worth of watches—were engaged in businesses having nothing to do with the sale a watches (e.g., plastics manufacturer, food wholesaler, fabric laminator, and photo equipment retailer)." *Id.*

At this point, State Street "halted its investigation of Sharp," deciding "not to confront the Spitzes with what it knew or to alert anyone else to the clear evidence of fraud in its possession." *Id.* ¶ 48. Sharp alleges that State Street wanted to avoid a potentially embarrassing loss such as the one it had recently suffered from the PT Imports fraud. *See id.* ¶ 49. State Street recognized that "without a substantial infusion of new funds, Sharp in all likelihood would be unable to repay the almost $15 million it owed State Street." *Id.* Thus, at a meeting held on November 30, 1998, State Street demanded and obtained Sharp's agreement to secure new financing—presumably from investors unaware of the fraud—and to use that financing to pay off the debt to State Street. *See id.* ¶ 50. State Street agreed to give Sharp until the end of March 1999 to retire

the debt. *See id.* To secure the new financing necessary to pay off State Street's line of credit by the March deadline, the Spitzes caused Sharp to raise an additional $25 million from the Noteholders, who had loaned Sharp $17.5 million the previous July. *See id.* ¶ 51.

Sharp claims that, upon learning that the Noteholders were planning to provide Sharp with additional debt financing, State Street deliberately concealed its knowledge of the Spitzes' fraud. Specifically, prior to the closing of the second Note offering, Dan Lobdell, the account officer assigned to the Sharp account, at the advice of State Street's counsel, repeatedly "avoided" phone calls from the Noteholders' representatives, who he knew would be inquiring about Sharp's credit. *See id.* ¶ 52. Furthermore, on or about March 22, 1999, State Street consented in writing to the additional $25 million in financing. Under the terms of State Street's loan agreement with Sharp, such consent was a prerequisite to Sharp's taking on any additional debt. *See id.* ¶ 53.

On March 23, 1999, without any knowledge of the Spitzes' fraud, the Noteholders purchased an additional $25 million in subordinated notes from Sharp.[3] *See id.* ¶ 54. A month later, Sharp paid State Street $12,250,024, using a portion of the March 1999 funds, thus reducing Sharp's debt from approximately $15 million to $2.7 million. *See id.* ¶ 55. State Street then accepted personal promissory notes from the Spitzes in exchange for releasing Sharp from the balance of the debt, although

"State Street had little confidence that the Spitzes would repay these notes." *Id.* Sharp alleges that between November 1998, when State Street discovered the fraud, and October 1999, the Spitzes looted Sharp of more than $19 million. *See id.* ¶ 58.

On July 1, 1999, KPMG withdrew its prior, unqualified audit opinions with respect to Sharp's financial statements for fiscal years 1997 and 1998, and terminated its engagement on behalf of Sharp, refusing to issue its audit opinion with respect to Sharp's financial statements for fiscal 1999. *See id.* ¶ 56.

### (2)

On September 7, 1999, the Noteholders commenced an involuntary chapter 11 bankruptcy proceeding against Sharp. *See id.* ¶ 57. The bankruptcy court granted an order of relief, and appointed FTI/ Kahn Consulting, Inc. as "responsible officer" of Sharp, removing the Spitzes from the operation of the business. *See id.* In November 2000, bankruptcy court entered a judgment of $44,378,650.30 against the Spitzes and three of their companies, jointly and severally. That judgment remains unsatisfied. *See id.* ¶ 16.

On May 30, 2001, Sharp commenced this adversary proceeding against State Street, alleging: 1) that State Street aided and abetted the Spitzes in breaching their fiduciary duties to the company; 2) that the $12 million dollar payment State Street received from Sharp in April 1999 constitutes a constructive and/or intentional

---

**3.** On May 30, 2001, the Noteholders commenced a separate action against State Street in New York State court, alleging facts virtually identical to those alleged in the present adversary proceeding. The Noteholders asserted claims for fraud, negligent concealment, and aiding and abetting fraud. In an unpublished opinion, dated April 14, 2003, which quoted extensively from the Bankruptcy Court's decision dismissing Sharp's adversary complaint, the court granted State Street's motion for summary judgment as to all of the Noteholders' claims. *See Albion v. State Street,* Index No. 602711/01 (Sup.Ct. N.Y.Co. Apr. 14, 2003) (Cahn, J.). Counsel for the Noteholders, who was present at oral argument in this appeal, represents that the Noteholders have appealed the state court's order granting summary judgment. *See* Tr. of Aug. 13, 2003 Oral Arg. at 2.

fraudulent conveyance under the D.C.L.; and 3) that in the event the $12 million dollar payment is ordered to be returned, State Street's claims should be equitably subordinated to the claims of Sharp's unsecured creditors. State Street moved to dismiss the complaint, relying principally on the following arguments: 1) that the complaint did not adequately plead an aiding and abetting claim under Rules 12(b)(6) and 9(b); 2) that the complaint did not state a claim for intentional or constructive fraudulent conveyance under the D.C.L.; and 3) that because Sharp's sole officers—the Spitzes—were the primary wrongdoers in the fraudulent scheme State Street was accused of aiding and abetting, the doctrine of *in pari delicto* barred the company from obtaining relief from third-parties for participating in the scheme.

In a Memorandum Decision dated July 30, 2002, the Bankruptcy Court granted State Street's motion and dismissed the common law aiding and abetting claim as well as the fraudulent conveyance claims for failure to state a claim. *See Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp. & Sharp Sales Corp.)*, 281 B.R. 506 (Bankr.E.D.N.Y.2002) (*"Bankr.Dec."*). These findings made it unnecessary for the Bankruptcy Court to reach State Street's *in pari delicto* defense, or to consider Sharp's equitable subordination claim. *See id.* at 524.

### Standard of Review

■ This court has appellate jurisdiction over Sharp's appeal pursuant to 28 U.S.C. § 158(a). The Bankruptcy Court's dismissal of Sharp's complaint for failure to state a claim is reviewed *de novo. See In re Maxwell Communication plc*, 186 B.R. 807 (S.D.N.Y.1995); *see also Americare Health Group, Inc. v. Melillo*, 223 B.R. 70, 75 n. 2 (E.D.N.Y.1998) ("In reviewing a decision of the bankruptcy court, a district court applies a *de novo* standing of review to conclusions of law ....") (citing *In re*

*Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990)).

Because the motion granted by the Bankruptcy Court was a motion to dismiss pursuant to Rule 12(b)(6), the veracity of all well-pleaded allegations in Sharp's adversary complaint must be assumed, and all reasonable inferences must be drawn in the light most favorable to Sharp. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). In reviewing a Rule 12(b)(6) motion, the court's function is to "assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." *See Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). The inquiry focuses not on "whether a plaintiff will ultimately prevail but on whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Accordingly, a motion to dismiss a complaint can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### Discussion

#### (1)

### Aiding and Abetting a Breach of Fiduciary Duty

■ The bankruptcy court dismissed Sharp's claim against State Street for aiding and abetting the Spitzes' breaches of their fiduciary duties for failure to state a claim under Rule 12(b)(6), finding that Sharp had not adequately pled State Street's knowledge of or participation in the Spitzes' wrongdoing. The cause of action for aiding and abetting a breach of fiduciary duty under New York common law is based on the well-established principle that "[a]nyone who *knowingly partici-*

*pates* with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust." *Wechsler v. Bowman,* 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941) (emphasis added). To state a claim for aiding and abetting a breach of fiduciary duty a plaintiff must plead: 1) a breach of fiduciary obligations to another; 2) that the defendant knowingly induced or participated in the breach; and 3) that the plaintiff suffered damages as a result of the breach. *See Kaufman v. Cohen,* 760 N.Y.S.2d 157, 169, 307 A.D.2d 113, 125 (1st Dep't 2003) (citing *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2d Cir.1987) and *Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986)).

■ There is no requirement that the alleged aider and abetter have an intent to harm. However, to satisfy the knowledge prong, the defendant must have *actual* knowledge of the primary violator's underlying breach of fiduciary duty. *See Kaufman,* 760 N.Y.S.2d at 169, 307 A.D.2d at 125. "Constructive knowledge of the breach of fiduciary duty by another is legally insufficient to impose aiding and abetting liability." *Id.*

■ Furthermore, to the extent the underlying breaches of fiduciary duty are based on fraudulent conduct, the complaint must meet the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure, which mandates that all allegations of fraud be pled with particularity. However, Rule 9(b)'s particularity requirement does not apply to "conditions of the mind"—including knowledge—which may be averred generally.

In this case, the first and third elements of the aiding and abetting claim—an underlying breach of a fiduciary duty and resulting damages—are adequately pled in Sharp's complaint. As officers of Sharp, the Spitzes owed fiduciary duties to the corporation, which they breached by causing Sharp to raise millions of dollars through fraudulently inflated financial statements, and by converting the fraudulently acquired proceeds as well as other corporate funds totaling in excess of $44 million. Further, Sharp was clearly damaged by the Spitzes' large-scale looting of the company—indeed, the Bankruptcy Court has entered a judgment against the Spitzes (and several of their companies) jointly and severally in the amount of $44,378,650.30.

The focus of the Bankruptcy Court's opinion—and of the parties' arguments in this appeal—concerns State Street's "knowing participation" in the Spitzes' conduct. The Bankruptcy Court began its analysis of this element of the aiding and abetting claim by endeavoring to "identify precisely the breach of fiduciary duty for which Sharp seeks to hold State Street liable." *Bankr.Dec.* at 513. In this connection, the Bankruptcy Court concluded that it was necessary to divide the Spitzes' fraud "into two conceptually distinct categories: (1) causing Sharp to raise millions of dollars through fraudulent representations; and (2) unlawfully diverting more than $44 million in Sharp funds to companies that provided no consideration to Sharp." *Id.* The court further contended that "[a]lthough these two types of wrongful conduct may have been combined by the Spitzes to form an overall fraudulent scheme, the wrongs are logically separable and give rise to two distinct causes of action and to different types of damages." *Id.* Moreover, the Bankruptcy Court noted, Sharp's claim against State Street—as evidenced by the damages sought in the complaint—was based on the Spitzes' looting of Sharp, rather than the accounting fraud that facilitated the looting. *See id.*; Compl. ¶ 58, "wherefore" clause "a" (seeking damages in excess of $19 million for the aiding and abetting claim, representing the sums misappropriated by the Spitzes

after State Street allegedly discovered the scheme).

The Bankruptcy Court's analysis of Sharp's aiding and abetting claim is, in large part, driven by this analytical framework. *See id.* at 515 ("[The] facts [alleged in Sharp's complaint] at most support an inference that State Street had actual knowledge that the Spitzes were fraudulently inflating Sharp's receivables," not that they were misappropriating corporate assets); *id.* at 517 ("[E]ven if accepted as adequate to plead that State Street assisted the Spitzes in defrauding the Noteholders, [Sharp's allegations] do[ ] not support a claim that State Street induced, participated in, or substantially assisted the Spitzes in diverting monies from Sharp.").

Sharp challenges the bankruptcy court's "bifurcation" of the Spitzes' fraud, arguing that "the Complaint ... sets forth a unified integrated fraud in which the Spitzes raised money on behalf of Sharp through false pretenses, and then stole that money for their own purposes." Sharp Mem. in Supp. of Appeal ("Sharp Mem.") at 17. At least at the pleading stage, plaintiff is correct that the rigid separation of the components of the Spitzes' scheme for purposes of evaluating the adequacy of the allegations of State Street's "knowing participation" is artificial and unwarranted. The fraudulent financial reporting through which the Spitzes induced creditors to loan money to Sharp and the Spitzes' embezzlement of those and other corporate funds were two steps in a single scheme. *See id.* ("[T]he fraud in the falsification of Sharp's sales and revenues in order to raise money was inextricably linked to the theft of monies from Sharp."). Indeed, as discussed *infra,* in a case such as this involving a closely-held corporation, the first step would have been all but pointless without the second. Thus, on a motion to dismiss, State Street's knowledge of the Spitzes' looting is not profitably analyzed in iso-

lation from State Street's awareness of the Spitzes' accounting fraud.

*Actual Knowledge*

At the outset, the Bankruptcy Court correctly observed that the complaint's extensive recitation of the circumstances that allegedly caused State Street to suspect fraud at Sharp—including, *inter alia,* Sharp's failure to comply with the reporting requirements set forth in its loan agreement, and the unmistakable parallels between Sharp's behavior and that of PT Imports—are not, standing alone, sufficient to meet the actual knowledge standard of an aiding and abetting claim under New York law. *See Bankr.Dec.* at 514. Indeed, the case law suggests that assertions that an alleged aider and abettor harbored well-founded—but unconfirmed—suspicions of the primary violator's wrongdoing are not sufficient to plead actual knowledge simply because, with the benefit of hindsight, those suspicions turned out to be correct.

In *Ryan v. Hunton & Williams,* 2000 WL 1375265 (E.D.N.Y. Sept.20, 2000), for example, defrauded investors alleged that Chemical Bank aided and abetted a "Ponzi" scheme carried out through accounts at the bank. The bank was "on notice of various 'red flags' that indicated fraudulent conduct." *Id.* at *1. Indeed, as soon as the accounts were opened, the bank's branch officer "suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit." *Id.* The fraud unit recommended that the accounts be closed immediately, and the accounts were shut down approximately a month later. *See id.* Prior to the closing of the accounts, however, bank officials "approved multiple wire transfers that resulted in the theft of investor funds." *Id.* at *2. The court dismissed the aiding and abetting claim, concluding, *inter alia,* that the plaintiffs failed to adequately plead

Chemical Bank's actual knowledge of the fraud. In this connection, the court noted that "[a]llegations that [a defendant] suspected fraudulent activity . . . do not raise an inference of actual knowledge of [the] fraud." *Id.* at *9. *See also Renner v. Chase Manhattan Bank*, 2000 WL 781081, at *12 (S.D.N.Y. June 16, 2000) (granting 12(b)(6) motion to dismiss claim against a bank for aiding and abetting customer's prime bank guarantee scam, despite bank officials' suspicions of fraud—which led them to reject one of customer's proposed transactions—because the complaint alleged "no factual basis for the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring"); *Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240 (S.D.N.Y.1996) (finding that brokerage firm and associated individual defendants could not be "charged with knowledge" of the looting of investors' funds despite defendants' awareness of plaintiffs' accusations; "knowledge of accusations without more" did not give rise to a duty to investigate, and did not support an inference of actual knowledge of the fraud),

In a case such as this, where an alleged aider and abetter in fact undertakes an investigation of the primary wrongdoer's conduct, determining the precise point at which evidence giving rise to suspicions of fraud reaches a cumulative critical mass sufficient to support an inference of actual knowledge is a fact intensive inquiry not easily resolved on the face of the pleadings. Sharp's complaint identifies State Street's review of the D & B Reports on November 18, 1998 as the moment when the bank's mounting suspicions concerning accounting irregularities at Sharp became actual knowledge of the Spitzes' fraud. *See* Compl. ¶¶ 47–48. As noted *supra*, these reports on 18 of Sharp's reported customers revealed that: 1) one of these customer had no known address; 2) another had actually gone out of business in 1991; and 3) "a number of others" did not appear to be in the watch business at all—despite Sharp's reported sales to these entities of millions of dollars in watches.

State Street argues that the information allegedly before it would have permitted inferences other than the presence of fraud at Sharp—*e.g.*, that Sharp was a failing business, or had management that was incompetent or negligent—and therefore "cannot compel an inference that State Street knew of Sharp's fraud." State Street Mem. in Opp'n to Appeal ("State Street Mem.") at 10–11. Aside from the fact that what State Street is alleged to have known makes these alternative hypotheses highly unlikely, even assuming that State Street could plausibly have reached such conclusions, the court is required, for purposes of this motion to dismiss, to draw all reasonable inferences in Sharp's favor. *See Moy v. Adelphi Institute, Inc.*, 866 F.Supp. 696 (E.D.N.Y. 1994) (citing *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99) ("Any uncertainty regarding inferences that may be drawn from a complaint's contentions must be determined in the light most favorable to the plaintiff."). The test, therefore, is not whether the facts alleged *compel* an inference favorable to Sharp, but rather whether they *permit* such an inference.

Viewed in this light, Sharp's allegations are sufficient to plead State Street's actual knowledge of both the false sales invoicing and probable looting by the Spitzes. State Street contends that the "limited information" revealed by the D & B Reports, concerning a subset of Sharp's customers, would not have led State Street to conclude that "the Spitzes were engaged in fraudulent conduct on a major scale," as the complaint alleges, Compl. ¶ 48—especially in light of Sharp's allegation that State Street confirmed that several of Sharp's largest reported customers were in fact purchasing Sharp products.

*See* State Street Mem. at 11; Compl. ¶ 38. However, State Street did not review the D & B Reports in a vacuum. Indeed, the bank had for months been troubled by Sharp's failure to comply with the reporting requirements, and its persistent refusals to provide State Street with access to its books or to permit physical inventory counts. The gravity of State Street's concerns is amply demonstrated by the serious investigative efforts it allegedly initiated, notwithstanding the fact that on paper "Sharp appeared to be oversecured and was not in monetary default." Compl. ¶ 35. In this context, the eventual discovery by State Street that Sharp was reporting sales to a supposed customer who had, in fact, gone out of business years earlier, or to others who by all appearances were not even in the watch business, provides a sufficient factual predicate to support Sharp's allegation—at the pleading stage—that State Street confirmed its suspicions, effectively crossing the line from constructive to actual knowledge of the Spitzes' fraud.

Despite State Street's discovery of evidence indicating that Sharp was not reporting its sales honestly, the Bankruptcy Court, relying on its bifurcation of the fraud, concluded that Sharp had not adequately pled State Street's actual knowledge of the "wrong for which Sharp seeks recovery against State Street," *viz.*, the Spitzes' conversion of Sharp's funds. *Bankr.Dec.* at 515. As the Bankruptcy

Court would have it, the facts pleaded concerning the D & B Reports "at most support an inference that State Street had actual knowledge that the Spitzes were fraudulently inflating Sharp's receivables," but "[t]he fact that a company is inflating its receivables does not necessarily mean that the company's principals are looting it." *Bankr.Dec.* at 515. In the particular circumstances of this case, however, it is difficult to imagine another possible reason for the Spitzes to report fictitious sales.[4] Sharp was not a publicly-held corporation, which could stand to benefit—at the expense of future shareholders—from inflating the apparent value of the company and thus driving up stock prices. In this respect, *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.1982)—cited by the Bankruptcy Court as an example of a corporate fraud involving fraudulent overstatement of inventory, but no subsequent looting—is inapposite. As the Bankruptcy Court explained, the *Cenco* case involved a publicly-traded corporation whose managers "inflated the company's apparent net worth and thus the market value of its stock[,]" using the "inflated stock to buy up other companies on the cheap." *Id.* at 451. No such motive could plausibly account for the reporting of fraudulent sales by Sharp's management. Indeed, inasmuch as there was no public market for Sharp's stock the nexus between the overvaluation of the company and looting by management is inescapable.[5]

---

4. When asked at oral argument to provide another plausible reason that might have motivated the Spitzes to report fraudulent sales, counsel for State Street responded that State Street might have supposed that the Spitzes "want[ed] to make the company look good until they sell it to a third party." Tr. of Aug. 13, 2003 Oral Arg. at 12. Such a hypothesis would have been highly speculative at best, however, since State Street would have had to assume that a prospective buyer would do very little due diligence and, therefore, not

discover that the sales volume was not as reported.

5. For these reasons, State Street's reliance on *In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F.Supp. 533 (S.D.N.Y.1980) (quoted in State Street Mem. at 17) is similarly unpersuasive. In that case, a Chapter X trustee sued a bankrupt corporation's former auditors who had certified financial statements that "materially overstated the income and assets of the [corporation] while materially understating its losses and liabilities." *Id.* at

That State Street actually suspected the Spitzes' embezzlement—even before the D & B Reports confirmed that Sharp was overstating its accounts receivable—is not a matter a speculation. The complaint specifically alleges that on November 6, 1998, Benninger, the loan workout specialist assisting in the investigation of Sharp pulled copies of Sharp checks that had passed through State Street's demand deposit account for the purpose of determining, *inter alia,* whether Sharp had made substantial payments to the Spitzes. *See* Compl. ¶ 45. Benninger made another such inquiry, approximately two weeks later. *See id.* These allegations undercut the notion that State Street might only have suspected that Sharp was a failing business. Of course, as discussed above, suspicions of the Spitzes' fraud, without more, would at best support an inference of constructive knowledge. However, State Street is alleged to have acquired sufficient evidence of the Spitzes' fraud to bring it beyond the realm of mere suspicion and surmise.

In sum, contrary to the Bankruptcy Court's conclusion, Sharp has plead sufficient facts which if proven could lead a reasonable jury to infer that State Street, a sophisticated commercial bank, actually knew—at least as of mid-November 1998—of a unitary fraud at Sharp, consisting of the fraudulent reporting of the company's accounts receivable in order to raise money to fund the looting of the corporation by corrupt management.

*Participation*

■ The "knowing participation" element of the aiding and abetting claim requires more than a defendant's knowledge of the primary violation. To state a claim, a plaintiff must allege some form of participation by the alleged aider and abetter in the primary wrongdoing. Broadly speaking, the case law identifies two forms of actionable "participation." First, aiding and abetting liability can attach where a defendant provides substantial assistance to the primary wrongdoer. "One provides substantial assistance if he affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables a [breach of fiduciary duty] to proceed." *Kolbeck,* 939 F.Supp. at 247. In general, inaction—*e.g.,* a failure to investigate or to alert third parties about another's misconduct—does not constitute substantial assistance, unless the defendant owes a special duty directly to the plaintiff. "It is well settled that without an independent duty to disclose, mere inaction does not amount to substantial assistance for purposes of determining aider and abettor liability." *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 494 (S.D.N.Y.2003) (citing *National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't 1987)). The existence of the primary violator's duty is not sufficient to hold a non-fiduciary secondary actor liable for inaction on an aiding and abetting theory.

■ Second, even without directly assisting in the commission of the underlying

536–37. The district court concluded that the management's embezzlement of surplus funds raised through artificially inflated stock sales was not a "reasonably foreseeable" result of the overstated financial statements:

It is arguably foreseeable, as a result of financial statements overstating the financial condition of a corporation, that securities issued and sold by that corporation will command a price higher than their true value, that purchasers will be injured as a

result and that the corporation will receive excessive funds in consideration for the securities. However, it is certainly not a direct or reasonably foreseeable result of such financial statements that inside management will embezzle such surplus funds for their personal use.

*Id.* at 540. Whatever the merits of that conclusion in the context of publicly-traded corporation, it is of limited relevance in this case.

wrong, a defendant may still be liable as an aider and abetter for "inducing" or "encouraging" a fiduciary to breach his duties to another. *See Kaufman*, 760 N.Y.S.2d at 169 (holding that a claim for aiding and abetting a breach of fiduciary duty requires, *inter alia*, allegations that the defendant knowingly *induced or participated* in the breach) (emphasis added); *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000) (same); *S & K Sales Co. v. Nike*, 816 F.2d 843, 849 (2d Cir.1987). The Restatement (Second) of Torts explains that "[a]dvice or encouragement to act," in instances where "the act encouraged is known to be tortious[,] ... has the same effect upon the liability of the advisor as participation or physical assistance." Restatement (Second) of Torts § 876, comment "d"; *see also Lindsay v. Lockwood*, 163 Misc.2d 228, 233, 625 N.Y.S.2d 393, 397 (Sup.Ct. Monroe Co.1994) ("The archetypical aiding and abetting defendant is one who encourages another to commit a tortious act.").

 In this case, Sharp contends that upon discovering the scheme in November 1998, State Street demanded that Sharp obtain new financing to retire its debt to State Street—financing which could only be obtained by expanding the scope of the fraud on the Noteholders, and which led to

an infusion of fresh money to fund the Sptizes' continued looting. Sharp further asserts that State Street affirmatively assisted the expanded fraud in three respects: first, instead of immediately foreclosing,[6] State Street provided Sharp with continued access to the line of credit to enable the Spitzes to find new innocent investors; second, one of State Street's employees deliberately avoided phone calls from the Noteholders' representative, who he knew would be calling to inquire about the Sharp credit; and third, State Street provided written consent to Sharp's sale of $25 million in subordinated notes to the Noteholders, without which the deal could not have gone forward, since, under the terms of Sharp's agreements with State Street, Sharp could not take on additional debt without State Street's consent.

State Street counters that Sharp's allegations are ultimately based on "inaction," *viz.* that State Street did not demand immediate repayment, did not respond to inquiries from the Noteholders or otherwise reveal the evidence of fraud it discovered, and did not interfere with Sharp's raising of new funds. Such inaction, State Street reasons, cannot constitute substantial assistance because State Street was not a fiduciary of (and, therefore, owed no special duty to) Sharp or its other creditors.[7] *See Manufacturers Hanover Trust*

---

**6.** The complaint alleges that Sharp's Credit Agreement with State Street provided for a demand line of credit, *see* Compl. ¶ 16, and, therefore, State Street had an absolute right to repayment upon demand at any time.

**7.** State Street is correct that the law imposes no affirmative duty on a bank to act when it learns that its borrower is committing a fraud since one does not wish to discourage lenders from conducting investigations of their borrowers. On the other hand, as a matter of public policy such a duty might be desirable to prevent the compounding of losses at least in those situations where the lender knows that by its consent to the refinancing, a looting scheme will be furthered. If State

Street's discovery of the looting did give rise to a duty to act-either by somehow reporting the fraud, or at the very least demanding immediate repayment-the scope of the looting would have been far smaller than it ultimately became. Indeed, as a result of the Spitzes' expanded fraud, the Noteholders negligent as they undoubtedly were in carrying out their due diligence were cheated out of an additional $25 million, while Sharp (and by extension its creditors) suffered a further loss of $19 million in diverted funds. However, despite these considerations, the law is clear that a lender is not a fiduciary of a borrower, and has no duty to act simply because it

Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993) ("[T]he mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary.") (cited in *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 173 Misc.2d 959, 662 N.Y.S.2d 190, 193 (Sup.Ct.N.Y.Co.1997)); *Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.*, 180 A.D.2d 588, 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower....").

In the end, despite Sharp's efforts to cast State Street as an instigator and active participant in the Spitzes' scheme, the complaint cannot overcome the absence of any duty on State Street's part to protect Sharp's interests. Indeed, each of the alleged affirmative acts that Sharp identifies as comprising State Street's "substantial assistance" are at root omissions—failures to act. By allowing Sharp continued access to the line of credit, for instance, State Street in essence preserved the status quo. Although it would have been in the long-term best interests of Sharp (and its other creditors) for State Street to have immediately cut off the Spitzes' access to the revolving loan facility and loan proceeds, State Street owed Sharp no duty of loyalty, and had no obligation to put Sharp's interests ahead of its own. Similarly, State Street could possibly have thwarted the fraud by disclosing what it knew to the Noteholders prior to the closing of the second financing. However, in the absence of a duty to disclose its knowledge of the Spitzes' fraud, State Street cannot be held liable for its failure to respond to inquiries from the Noteholders' representative.[8] *See Renner*, 2000 WL 781081, at *9 (concluding that a bank official did not aid and abet a customer's fraud by "fail[ing] to respond" to inquiries concerning the customer). Indeed, the failure to answer or respond to phones calls (even if motivated by a conscious desire not to disclose information) can hardly be characterized as more than inaction.

The closest Sharp comes to identifying any act of participation by State Street is the written consent State Street gave in March 1999 to the Noteholders' purchase of $25 million in subordinated notes from Sharp. Sharp argues that State Street's act of consenting to the transaction was a *sine qua non* of the Spitzes' expanded fraud, since without the consent, Sharp would not have been able to borrow any additional money, and the Spitzes' continued looting was funded in part by the additional funds advanced by the Noteholders. However, State Street's contractually bargained-for authority to block Sharp from further borrowing, did

---

suspects or even knows of a fraud perpetuated by the borrower's management.

The conflicting policy considerations discussed above are also reflected in the criminal law, but the result may well be the opposite. Assuming that the bank officials had actual knowledge that the Spitzes were intending to loot the Noteholders' monies that were not being used to satisfy Sharp's debt to State Street and that they were told this was the only way the bank would ever get its money back, they might well be criminally liable as aiders and abettors under 18 U.S.C. § 2(a). *See* Sand et al., *Modern Jury Federal Jury Instructions [Criminal]* Vol. 1, Chapter 11, *Aiding and Abetting Instruction* 11-2, pp. 11-3-4

**8.** Had State Street made any false or misleading statements to the Noteholders, it might have had a duty to correct any resulting misimpressions. Surely, however, the Noteholders could not have viewed State Street's failure to respond to their inquiries as any kind of endorsement of the proposed transaction. If anything, under the circumstances, State Street's evasiveness might have aroused a prudent investor's suspicions.

not confer on the bank an affirmative duty to protect Sharp—and still less to protect other third-parties, such as the Noteholders—from the actions of Sharp's management. Significantly, although the consent made it possible for the Spitzes to seek additional financing through fraud, there is no allegation that State Street did anything to induce the Noteholders to lend to Sharp. Sharp has not alleged, for example, that the consent was intended as—or could have been reasonably interpreted by the Noteholders to be—a representation by State Street as to Sharp's creditworthiness. More importantly, although State Street may have anticipated that the Spitzes would continue to loot the company, they had no duty to intervene to prevent breaches of fiduciary duty by Sharp's management.

Equally unavailing are Sharp's efforts to hold State Street accountable for encouraging or inducing the Spitzes to expand the scope of their fraud. Although the case law and the Restatement identify "inducement" as an independent form of participation, there is scant authority setting forth exactly what conduct would qualify as inducement in this context. *See* Sharp Mem. at 13 ("[W]e are not aware of any mention of inducement of this sort in the case law...."). In its complaint, Sharp asserts that

> on November 30, 1998, State Street demanded and obtained Sharp's agreement to secure new financing from investors unaware of the fraud, and to use that financing to pay off State Street's line of credit. In exchange, State Street agreed to give Sharp until March 31, 1999 to obtain this new financing and to retire the debt to State Street.

Compl. ¶ 50. The Bankruptcy Court concluded that this pleading violated Rule 9(b), "by failing to allege who made the demand, who else was present, exactly what was said, and where this occurred." *Bankr.Dec.* at 517.

Assuming that Rule 9(b) applies to these allegations, and that the pleading falls short of the rule's particularity threshold, this would not, of course, be grounds for dismissal with prejudice, since Sharp could be granted leave to replead to provide more detail. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend."); *accord United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 225 (S.D.N.Y.2002). However, even accepting the adequacy of Sharp's pleading under Rule 9(b), it is difficult to see how State Street could be held accountable for inducing a fraudulent scheme that was well underway before State Street is alleged to have even had any knowledge of it. The allegations of the complaint amply demonstrate that the Spitzes required no encouragement or inducement to defraud creditors or to breach the duties of loyalty that they owed Sharp. Indeed, more than half of the $44 million stolen by the Spitzes had already been diverted by the time State Street allegedly discovered the fraud.

Although Sharp has adequately pled State Street's knowledge of the Spitzes' scheme, the failure of the complaint to identify any affirmative act of participation in the Spitzes' breach of their fiduciary duties to Sharp necessitates the dismissal of the complaint for failure to state a claim.

### (2)

### Fraudulent Conveyance Claims

*Constructive Fraudulent Conveyance*

█ The D.C.L., under which Sharp brings the second, third, fourth and fifth counts of its complaint, is New York's version of the Uniform Fraudulent Conveyances Act (the "U.F.C.A."). The statute

codifies a set of legal principles that are intended to "protect creditors by invalidating certain transactions that render debtors' assets unreachable." Note, *Good Faith & Fraudulent Conveyances*, 97 Harv. L.Rev. 495, 495 (1983).

In the second, third, and fourth counts of the complaint, Sharp alleges that the $12 million payment that State Street received from Sharp in April 1999, in satisfaction of Sharp's valid pre-existing debt to State Street, constitutes a constructive fraudulent conveyance under the D.C.L.

Pursuant to the D.C.L. a conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration," as defined in the statute, *and* any of the following conditions is met: 1) the transferor is insolvent or will be rendered insolvent by the transfer in question[9]; 2) the transferor making the conveyance is a defendant in an action for money damages who fails to satisfy a judgment entered against him[10]; 3) the transferor is engaged or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital[11]; or 4) the transferor believes that it will incur debts beyond its ability to pay.[12]

Sharp alleges that the challenged payment to State Street was made while Sharp was insolvent; that at the time of the payment Sharp was engaged or was about to engage, in a transaction for which the property remaining in its possession constituted unreasonably small capital; and that Sharp believed it would incur debts beyond its ability to pay. *See* Compl. ¶¶ 70, 76, 81. Accepting these allegations as true, Sharp must still adequately plead the absence of fair consideration to state a claim for constructive fraudulent conveyance under the D.C.L. *See Atlanta Shipping Corp., Inc. v. Chemical Bank,* 818 F.2d 240, 248 (2d Cir.1987) ("An essential element of a claim pursuant to DCL §§ [273–275] is lack of fair consideration.").

■ The statute defines "fair consideration" in the following manner:

Fair consideration is given for property . . .

a. When, in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property . . . is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property . . . obtained.

9. *See* D.C.L. § 273 ("Every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration.").

10. *See* D.C.L. § 273a ("Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.").

11. *See* D.C.L. § 274 ("Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.").

12. *See* D.C.L. § 275 ("Every conveyance made . . . without fair consideration when the person making the conveyance . . . intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.").

*See* D.C.L. § 272. Thus, there are three elements to "fair consideration" under the D.C.L.: first, the recipient of the debtor's property must either convey property or discharge an antecedent debt in exchange; second, the exchange must be for a fair equivalent; and third, the exchange must be "in good faith." *See HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1058–59 (2d Cir.1995).

Sharp acknowledges that the $12 million payment to State Street satisfied an antecedent debt, and that the exchange was for fair equivalent value. The gravamen of Sharp's constructive fraudulent conveyance claim is that State Street did not receive the payment in good faith because at the time of the payment, it was aware of the Spitzes' fraud (and thus knew or had reason to know of Sharp's insolvency), and because the payment was intended as a *quid pro quo* for Sharp's assistance in the fraud on the Noteholders.

"The precise meaning of 'good faith' in the context of the law of fraudulent conveyances has been the bone of jurisprudential contention among the states that have adopted the UFCA." *See Ostashko v. Ostashko,* 2002 WL 32068357, at *22 (E.D.N.Y. Dec. 12, 2002); *see also Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504 (1st Cir.1987) (Breyer, J.) (recognizing that "courts and commentators have had difficulty determining the meaning of 'good faith' in [the] definition of 'fair consideration.'"). For one thing, state and federal courts in New York have differed as to whose good faith matters, with some suggesting that both parties' good faith must be established, and others contending that the good faith requirement applies to the transferee alone. *Compare, e.g., Julien J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 412 N.Y.S.2d 901 (2d Dep't 1979) ("[T]he good faith of both transferor and transferee is stressed as an indispensible condition in the definition of fair consideration."), *aff'd,* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979); *with HBE Leasing Corp.,* 61 F.3d at 1058 ("The 'good faith' in § 272 is the good faith of the transferee[.]").

More fundamentally, courts have struggled to determine the role of a subjective "good faith" requirement in the context of constructive fraudulent conveyance law, which is designed to "reduc[e] the role of the debtor's subjective intent and expand[ ] the role of objective factors." Note, *supra* at 497; *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 428–29 (Bankr.S.D.N.Y.1998) ("Although tagged with the title 'fraudulent,' fraud has nothing to do with the constructive fraudulent conveyance claim. The transaction is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee."); *see also United States v. McCombs,* 30 F.3d 310, 326 n. 1 (2d Cir.1994) ("We are not entirely clear from the case law, however, just how the 'good faith' requirement under section 272 operates in the context of a fraudulent conveyance claim under section 273, a constructive fraud statute where the issue of intent is irrelevant."). Indeed, D.C.L. §§ 273, 273a and 275 expressly indicate that the intent of the transferor is irrelevant. On the other hand, some inquiry into the "mental states of the parties to the transaction" would appear to be necessary "in order to preserve the distinction between 'good faith' and 'fair equivalent,'" *Ostashko,* 2002 WL 32068357, at *22, which both the text of the D.C.L. and the case law clearly indicate are two distinct requirements. *See* D.C.L. § 272 (defining fair consideration as entailing the conveyance of property or satisfaction of an antecedent debt "as a fair equivalent ... *and in good faith.*") (emphasis added); *In re Manshul Construction Corp.,* 2000 WL 1228866, at *52 (S.D.N.Y.2000) ("Even if a transaction involves an exchange of fair

equivalents, a transaction also lacks fair consideration if it was not made in good faith."); *Ede v. Ede*, 193 A.D.2d 940, 598 N.Y.S.2d 90, 92 (3d Dep't 1993) ("[F]air consideration requires that the exchange not only be for equivalent value, but also that the conveyance be made in good faith[.]") (citations omitted); *see also* Note, *supra* at 505 (noting that an assessment of good faith that focuses solely on the values exchanged "effectively eliminates the good-faith requirement and thus disregards the statutory language specifying two distinct elements of 'fair consideration.' ").[13]

State Street argues categorically, that the repayment of a valid antecedent debt—at least where a fair equivalent is exchanged—cannot be a constructive fraudulent conveyance, unless the transfer is made to an insider, such as an officer, director, or major stockholder of the transferor. *See Atlanta Shipping*, 818 F.2d at 249 ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."). In response, Sharp devotes much of its argument to the proposition that "good faith" is an independent element of "fair consideration." However, this does not do much to illuminate the precise content of the requirement.

Taken by themselves, Sharp's allegations concerning State Street's knowledge of the Spitzes' scheme and the bank's resulting awareness that Sharp's reported financial condition did not reflect the company's actual financial condition— *i.e.*, that the company was insolvent—are

not enough to support a lack of "good faith" under the D.C.L.'s definition of fair consideration. Some courts have suggested that "good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer." *In re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585, 617 (Bankr.E.D.N.Y.1981), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982); *accord Ostashko*, 2002 WL 32068357, at *23; *In re Centennial Textiles, Inc.*, 220 B.R. 165, (Bankr. S.D.N.Y.1998). However, a finding that good faith is lacking based solely on the transferee's awareness that the transferor (for one reason or another) lacks the resources to satisfy all his debts would run afoul of the fundamental principle that a preference—a payment by an insolvent debtor satisfying debts to one creditor at the expense of others—is not a fraudulent conveyance. *See* G. Glenn, *Fraudulent Conveyances and Preferences* § 289 (1940) ("If there is one point more ungrudgingly accepted than others, it is that a preferential transfer does not constitute a fraudulent conveyance.").

In a sense, all preferences prejudice the unfavored creditors, inasmuch as the debtor's remaining assets are by definition insufficient to fully cover the debts owed to them. However, the correction of this unfairness is not the aim of fraudulent conveyance law. *See Boston Trading*, 835 F.2d at 1510 ("The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it does not normally try to choose among them."). As Justice

---

13. Given the confused state of the case law, these questions concerning the content of the good faith requirement would be appropriate for certification to the New York Court of Appeals. Unfortunately, "[n]either the New York Court of Appeals rule implementing the relevant state constitutional provision nor the

federal provisions providing for certification to New York's highest court allows for a decision to certify by the district courts in the Second Circuit." *Hamilton v. Accu–Tek*, 62 F.Supp.2d 802, 847 (E.D.N.Y.1999) (citing 22 NYCRR § 500.17, Second Circuit Local Rule 0.27).

Sullivan of the First Department of the Appellate Division has explained:

> [A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.... It is of no significance that the transferee has knowledge of such insolvency. Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect.

*Ultramar Energy Limited v. Chase Manhattan Bank, N.A.,* 191 A.D.2d 86, 90–91 599 N.Y.S.2d 816, 819 (1st Dep't 1993) (internal citations and quotation marks omitted).

Concededly, what is alleged here is different than the typical preference, since State Street is alleged to have known not just of Sharp's insolvency but also that the particular funds used to repay it were acquired by dishonest means. However, absent any allegations of State Street's participation in the fraud on the Noteholders, this knowledge alone is not sufficient to establish a lack of good faith, and thus the absence of fair consideration, under the D.C.L. § 272. This issue was extensively analyzed in *Boston Trading Group, Inc.,* 835 F.2d 1504 (1st Cir.1987), a First Circuit opinion authored by then Circuit Judge Stephen Breyer. *Boston Trading* involved a transferee who received payments for the sale of a business knowing that the transferors had obtain the transferred funds through fraud. *See id.* at 1506. The court concluded that the despite the transferee's knowledge of the illegitimate source of the funds, his receipt did not amount to a lack of good faith under Massachusetts' fraudulent conveyance statute—identical in all relevant respects to the D.C.L. *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 634 n. 5 (2d

Cir.1995) (noting that both the Second Circuit and New York courts have "encouraged recourse to case law of other jurisdictions[,]" "[i]n order to promote a uniform national interpretation of the UFCA."). Judge Breyer explained that, at least where the transferee did not participate in—but only knew about—the original fraud, the transferee had at most obtained a preference. *See id.* at 1512. Fraudulent conveyance law was not implicated because the fraud did not concern the conveyance itself, but only the "manner in which the ... debt" to the defrauded party arose. *Id.* at 1510.

Sharp argues on this appeal, as it did before the Bankruptcy Court, that a different result is compelled by the Second Circuit's holding in *HBE Leasing,* 48 F.3d 623. Specifically, Sharp relies on an excerpt from that decision in which the court concluded that

> where ... a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme.

*Id.* at 636. Sharp contends that at the time of the transfer, State Street had actual—or at the very least constructive—knowledge of the fraudulent scheme through which Sharp acquired the funds used to retire the debt to State Street. Indeed, it is alleged to have known at the time it gave its consent to the $25 million note purchase that the funds were being raised fraudulently and would be used, in part, to refinance Sharp's debt to State Street, and that any surplus funds raised would quite likely be looted by the Spitzes. As the Bankruptcy Court properly concluded, however, an examination of the facts of *HBE Leasing* reveals the inapplicability of that case here.

In *HBE Leasing,* judgment creditors sought to set aside mortgages given by the judgment debtor to the mother of the debtor's principal. The mortgages were given in exchange for a contemporaneous advance of cash that constituted equivalent value. However, shortly after the funds advanced in exchange for one of the mortgages was received by the debtor, the funds were disbursed to the debtor's principal, purportedly in satisfaction of loans he had previously made to the debtor. When examined in isolation, that mortgage could not be avoided as constructively fraudulent. Even if the mother were regarded as an insider, the rule that preferential payments to insiders are *per se* lacking in good faith, *see, e.g., Farm Stores, Inc. v. School Feeding Corp.,* 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (1984), *aff'd,* 64 N.Y.2d 1065, 489 N.Y.S.2d 877, 479 N.E.2d 222 (1985), did not apply, since the mortgages secured a contemporaneous advance of funds—not a pre-existing debt—and thus had no net effect on the debtor's balance sheet. *See HBE Leasing,* 48 F.3d at 635. Instead, the Second Circuit applied the good faith element of the D.C.L's definition of fair consideration to collapse the two transactions by which the money given to the debtor in exchange for the mortgage was immediately reconvened for a purpose deemed fraudulent under the D.C.L., *viz.* to bestow a preference on an insider. Applying this framework, "the net result was that [the mother] received a mortgage from the judgment debtor, while [the son] received money from [the mother]. Thus at the end of the day [the judgment debtor] received nothing in exchange for the first mortgage." *Id.* at 637. The Second Circuit held that the mother's actual or constructive knowledge at the time she received the mortgages that the consideration she advanced in exchange would be used for a fraudulent purpose was sufficient to show a lack of good faith. *See id.*

Furthermore, the Second Circuit explicitly considered (and rejected) an alternative ground advanced by the parties seeking to avoid the transaction—namely, that a lack of good faith on the part of the transferee (*i.e.,* the mother) was grounds for avoiding the mortgage "independent of the role that mental states play in the analysis whereby transactions are collapsed." *Id.* at 636. Based both on the factual scenario involved in the case and on the Second Circuit's holding that a lack of good faith was not an independent ground for avoiding the mortgage, the Bankruptcy Court reached the following conclusion: the relevance of the Second Circuit's assertion that actual or constructive notice of "any fraudulent scheme" is enough to establish the transferee's lack of good faith is limited to cases involving "a fraudulent scheme that has the effect of depriving the debtor of the benefit of the consideration given in exchange for the transfer that is sought to be avoided—for example knowledge that would provide a basis for collapsing two transactions under the analysis set forth in *HBE Leasing.*" *Bankr.Dec.* at 520. Further undercutting Sharp's assertion that *HBE Leasing* renders a transfer constructively fraudulent when the transferee knows that the funds transferred were fraudulently acquired is the fact that the Second Circuit cited with approval Judge Breyer's decision in *Boston Trading*—a decision that, as discussed above, reached precisely the opposite result. *See HBE Leasing,* 48 F.3d at 636.

The transaction at issue in *HBE Leasing* involved a contemporaneous exchange between a transferor and transferee—not the repayment of a pre-existing debt. The knowledge to which the Second Circuit referred was the transferee's actual or constructive awareness at the time it advanced the consideration that the transferor would not, in fact, either retain those funds or expend them for some legitimate

corporate purpose. The intent of the holding was to avoid a facially legitimate transfer that was, in fact, designed to disguise a scheme that would effectively deny the debtor the use of the consideration, thus unfairly frustrating the claims of other creditors. Although the mortgage was not suspect when viewed in isolation, in context it operated as a means of turning the corporation's real property into cash that could be diverted to an insider, thus depriving outside creditors not only of the property subject to the mortgage, but also, ultimately, of the consideration initially advanced to secure it. In this case, the consideration advanced by State Street was the loan proceeds that gave rise to the antecedent debt. There is no allegation that State Street knew when it advanced those funds that they would be used for any improper purpose. Thus, there was nothing suspect about the legitimacy of Sharp's pre-existing debt to State Street.

A different result might be warranted if there were some reason to doubt State Street's status as a legitimate creditor of Sharp—if there were any allegation, for example, that Sharp's debt to State Street had somehow been manufactured with the intent of ultimately frustrating the rights of legitimate creditors through a collusive preferential "repayment." There is no question that a fraud occurred in this case. However, the fraud was not in the transfer to State Street—which was a bona fide creditor that advanced funds to Sharp in good faith—but rather the manner in which the funds transferred to repay the debt were raised. It is not the purpose of the fraudulent conveyance law, however, to remedy this wrong. The defrauded Noteholders may well be able to seek relief under other legal theories, such as restitution. *See* Restatement (First) of Restitution § 202. It is understandable that the bankruptcy trustee representing Sharp would seek to frame his claim in terms of the fraudulent conveyance law, since a

trustee in bankruptcy is not generally empowered to pursue the claims of the debtor's creditors, but is specifically authorized under the bankruptcy code to pursue fraudulent conveyance claims on behalf of the debtor's unsecured creditors. *See* 11 U.S.C. § 544(b). Nevertheless, the limitations on the claims available to the bankruptcy trustee do not justify expanding the proper bounds of fraudulent transfer law in this case.

*Actual Fraudulent Conveyance*

■ Alternatively, Sharp asserts that the $12 million payment to State Street is avoidable as an intentional fraudulent conveyance under D.C.L. § 276. The statute provides that

> Every conveyance made … with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

■ An intentional fraudulent conveyance claim focuses on the intent of the transferor. If there was an actual intent to "hinder, delay, or defraud" creditors, the conveyance can be set aside even if the debtor remains otherwise solvent and even if fair consideration is given in exchange for the transfer. *See McCombs*, 30 F.3d at 328; *Le Café Crème, Ltd. v. Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 239 (Bankr.S.D.N.Y.2000). Because it is based on fraudulent intent, a claim under § 276 must be plead with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *See Atlanta Shipping*, 818 F.2d at 251.

■ Recognizing that it is typically difficult to demonstrate intent by direct evidence, the courts have identified various "badges of fraud" that serve as circumstantial evidence of actual intent. The

badges of fraud identified by the Second Circuit include:

1. lack or inadequacy of consideration;
2. family, friendship or close associate relationship between the parties;
3. retention of possession, benefit or use of the property in question by the debtor;
4. the financial condition of the party sought to be charged both before and after the transaction in question
5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency of threat of suits by creditors; and
6. the general chronology of the events and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582–83 (2d Cir.1983). The Bankruptcy Court pointed out that Sharp had not alleged any of the badges of fraud in this case. *See Bankr.Dec.* at 522. Sharp protests that the badges of fraud are irrelevant here because of the clear showing of the Spitzes' actual fraudulent intent, as demonstrated by the allegations that Sharp was grossly inflating its reported sales and revenues, and using these inflated financial statements to induce the Noteholders to advance sums far in excess of what they would have been willing to provide had they known Sharp's true financial picture. *See* Sharp Mem. at 23–24.

■ Although the presence of any particular badge of fraud is by no means a prerequisite to a finding of actual intent to defraud, the badges of fraud appropriately focus the inquiry on the circumstances that suggest a *conveyance* was made with fraudulent intent, *viz.* with the purpose of placing a debtor's assets out of the reach of creditors. As in *Boston Trading,* the fraud detailed in Sharp's complaint concerns the manner in which the debt to the Noteholders arose, not the subsequent conveyance of those funds to State Street, which was a legitimate creditor of Sharp.

Finally, Sharp asserts that payment to State Street was made with the actual intent to defraud creditors because it was made for the purpose of "buying" State Street's continued silence, and thus its assistance in the fraud. As noted *supra,* State Street owed no duty to Sharp or its creditors, and its silence did not constitute an act of participation in the Spitzes' fraud. For these reasons, Sharp's intentional fraudulent conveyance claim fails.

## Conclusion

For the reasons state above, the judgment of the Bankruptcy Court is affirmed. The clerk of the court is directed to close this case.